**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HEVER ALBERTO MENDOZA-LINARES, | No. 20-71582 |
| Petitioner, | Agency No. A213-209-821 |
| v. | |
| MERRICK B. GARLAND, Attorney General, | OPINION |
| Respondent. | |

On Petition for Review of an Order of an
Immigration Judge

Argued and Submitted December 7, 2021
San Francisco, California

Before: Susan P. Graber and Daniel P. Collins, Circuit
Judges, and Jennifer Choe-Groves,[*] Judge.

Opinion by Judge Collins;
Dissent by Judge Graber

---

[*] The Honorable Jennifer Choe-Groves, Judge for the United States
Court of International Trade, sitting by designation.

# SUMMARY[**]

## Immigration

Dismissing Hever Alberto Mendoza-Linares's petition for review from a decision of an immigration judge affirming an asylum officer's negative credible fear determination in expedited removal proceedings, the panel held that because Congress has clearly and unambiguously precluded the court from asserting jurisdiction over the merits of individual expedited removal orders, even with regard to constitutional challenges to such orders, and because that prohibition on jurisdiction raises no constitutional difficulty, the court lacked jurisdiction over Mendoza-Linares's petition for review.

Mendoza Linares entered the United States without inspection and was immediately detained by Officers from the Department of Homeland Security ("DHS"). Two days later, pursuant to 8 U.S.C. § 1225, DHS issued an expedited removal order against him. After Mendoza-Linares asserted a fear of persecution, an asylum officer conducted a credible fear interview and concluded that Mendoza-Linares had not shown a reasonable fear of future persecution on account of a protected ground. An IJ upheld that determination, rejecting Mendoza-Linares's asylum claim solely because of the then-operative interim regulation, 8 C.F.R. § 208.13(c)(4) (2020)—the so-called "Transit Bar," which provided that, subject to certain enumerated exceptions, an alien (such as Mendoza-Linares) who arrived in the U.S. across the southern border "after transiting through at least

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States" was categorically ineligible for asylum.

By limiting the availability of asylum, the Transit Bar effectively increased the standard of proof that an alien must satisfy to avoid expedited removal. An alien subject to the Transit Bar may still avoid expedited removal by establishing a *reasonable fear* of persecution or torture for purposes of withholding of removal and protection under the Convention Against Torture. The "reasonable fear" of persecution screening standard used to determine, in expedited removal proceedings, whether further consideration of withholding of removal is warranted is the same standard required to establish a "well-founded fear of persecution" in the ordinary asylum context. However, pursuant to 8 U.S.C. § 1225(b)(1)(B)(v), an alien in expedited removal proceedings, but *not* subject to the Transit Bar, need only establish that there is a *significant possibility*, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish the well-founded fear of persecution necessary for asylum. Thus, the practical effect of the Transit Bar is to raise the standard for avoiding expedited removal from (1) a significant possibility that the alien could show a well-founded fear of persecution to (2) a showing of a well-founded fear of persecution. Applying the latter standard, the IJ upheld the asylum officer's negative reasonable fear determination as to withholding of removal. The IJ also found no reasonable fear of torture.

Mendoza-Linares argued that, because the asylum officer and the IJ relied on the Transit Bar in finding that he lacked a credible fear of persecution, he was denied, without due process, his statutory rights under § 1225. The panel held that it could not reach the merits of Mendoza-Linares's

argument because it lacked subject matter jurisdiction over the entirety of the petition under 8 U.S.C. § 1252(a)(2)(A). The panel explained that the plain text of § 1252(a)(2)(A) comprehensively bars judicial review of matters relating to expedited removal orders, including the merits of the credible fear determination, except as provided in §1252(e), which provides only for very limited challenges in an appropriate district court. The panel concluded that none of those exceptions applied here.

The panel explained that § 1252(e) authorizes only two limited forms of judicial review of matters concerning expedited removal—namely, (1) a very limited form of judicial review in habeas corpus proceedings; and (2) review of certain challenges on the validity of the system, which must be brought exclusively as an action instituted in the United States District Court for the District of Columbia. Because habeas proceedings must be instituted in the appropriate district court and not in the first instance in this court, and because a petition for review in this court is distinct from a habeas corpus petition, the panel concluded that the limited authorization of habeas corpus proceedings did not grant this court jurisdiction over Mendoza-Linares's petition for review brought under § 1252(a)(1). Likewise, the limited grant of jurisdiction to the D.C. district court did not confer any jurisdiction on this court.

Even if Mendoza-Linares's petition for review could properly be characterized as invoking the limited jurisdiction conferred on an appropriate district court under § 1252(e), the panel concluded that it could not transfer this matter because both the D.C. district court, and the United States District Court for the Southern District of California, which would have venue over a habeas corpus petition, would both lack jurisdiction over the matter. The panel explained that any action in the D.C. district court would not have been timely. The panel also considered whether Mendoza-

Linares had raised a sufficient question as to whether he "was ordered removed" under §1225(b)(1) to invoke the exception of §1252(e)(2)(B). The panel rejected Mendoza-Linares's argument that because his credible fear was not evaluated under the correct statutory standards—due to application of the Transit Bar—the order did not constitute an expedited removal order under §1225(b)(1). Thus, because it was clear the agency entered an expedited removal order under § 1225(b)(1), the panel concluded that Mendoza-Linares had no colorable basis for invoking the very limited habeas jurisdiction in § 1252(e)(2), and the Southern District would lack jurisdiction over this matter.

The panel concluded that § 1252(a)(2)(D), which restores jurisdiction over certain constitutional questions and questions of law in removal cases, makes unambiguously clear that §§ 1252(a)(2) and (e) bar judicial review of constitutional challenges to expedited removal orders. The panel further concluded that, even if the court retained jurisdiction over "colorable constitutional claims," Mendoza-Linares's petition must still be dismissed because he had not presented any such colorable constitutional claim. Mendoza-Linares contended under *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669–75 (9th Cir. 2021), that the Transit Bar's substantive limitations on the granting of asylum were contrary to the immigration statute. The panel explained that although this was a colorable *statutory* argument, it did not present a colorable *constitutional* claim.

Because § 1252 barred the court from asserting jurisdiction over Mendoza-Linares's petition for review, and a habeas court would likewise lack jurisdiction, the panel wrote that the only remaining question was whether, by denying all judicial review, § 1252 was unconstitutional as applied in this case. In view of the fact that arriving aliens such as Mendoza-Linares lack any constitutionally protected

due process rights concerning whether they will be removed or admitted, the panel concluded that the answer to that question was plainly no. Further, the panel explained that the Supreme Court in *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020), expressly rejected the alternative theory that a complete denial of judicial review in expedited removal cases effects an unconstitutional suspension of the writ of habeas corpus.

Dissenting, Judge Graber wrote that the majority opinion flouts both Congressional intent and binding precedent from the Supreme Court and this court, depriving a litigant of the judicial review to which he is entitled with respect to his colorable—indeed, meritorious—constitutional claim. In Judge Graber's view, (1) the court had jurisdiction to review Mendoza-Linares's colorable constitutional claim, because no other judicial forum exists in which that claim can be reviewed and Congress has not explicitly foreclosed the court's review of colorable constitutional claims; and (2) Mendoza-Linares did not receive the process that Congress provided because the IJ did not consider whether Mendoza-Linares had established a significant possibility that he could show eligibility for asylum. Accordingly, Judge Graber would grant the petition and remand for further proceedings.

## COUNSEL

Brian C. Baran (argued), Reichman Jorgensen Lehman & Feldberg LLP, Washington, D.C.; Kate Falkenstien, Reichman Jorgensen Lehman & Feldberg LLP, Redwood Shores, California; for Petitioner.

Aric A. Anderson (argued), Trial Attorney; Holly M. Smith, Assistant Director; Brian Boynton, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice; for Respondent.

**OPINION**

COLLINS, Circuit Judge:

Petitioner Hever Alberto Mendoza-Linares, a citizen of El Salvador, jumped the border fence near Tecate, California and was immediately apprehended by U.S. authorities. He had no previous ties to the United States and, indeed, had never been to this country before. He was immediately placed into expedited removal proceedings, and an asylum officer and an immigration judge ("IJ") concluded that he had failed to make a sufficient showing to warrant any further proceedings concerning his requests for asylum or other relief. Accordingly, an expedited order of removal was issued against him, with no possibility of appeal to the Board of Immigration Appeals ("BIA").

As an arriving immigrant caught at the border, Mendoza-Linares "has no constitutional rights regarding his application" for asylum. *See Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) (citation omitted); *see also id.* at 1981–82 (explicitly rejecting this court's holding that an arriving alien has a "constitutional right to expedited removal proceedings that conformed to the dictates of due process"). Taking advantage of this unique constitutional status of arriving aliens with no ties to the United States, Congress has chosen to explicitly bar nearly all judicial review of expedited removal orders concerning such aliens, including "review of constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(A), (D); *see also Guerrier v. Garland*, 18 F.4th 304, 311–13 (9th Cir. 2021). Nonetheless, Mendoza-Linares has filed a petition for review in this court, claiming that we retain jurisdiction to decide the "colorable constitutional claim" that he contends he has presented with respect to his expedited removal order. But as we indicated in *Guerrier*, "*Thuraissigiam*'s

conclusion that the Due Process Clause does not require review of how the agency determines whether a noncitizen subject to expedited removal is eligible for asylum precludes this court" from asserting jurisdiction in such a case, "despite [the alien's] raising a colorable constitutional claim." 18 F.4th at 312.

Because Congress has clearly and unambiguously precluded us from asserting jurisdiction over the merits of individual expedited removal orders, even with regard to constitutional challenges to such orders, and because that prohibition on jurisdiction raises no constitutional difficulty, we conclude that we lack jurisdiction over Mendoza-Linares's petition. Accordingly, we dismiss his petition for lack of jurisdiction.

## I

Mendoza-Linares is a native and citizen of El Salvador. He traveled from El Salvador by land and illegally entered the United States by jumping over the international border fence near Tecate, California on February 10, 2020. He was immediately apprehended and detained by officials from the Department of Homeland Security ("DHS").

Section 235(b)(1) of the Immigration and Nationality Act ("INA") contemplates that aliens arriving in the United States will be screened for eligibility for expedited removal.[1]

---

[1] Because title 8 of the United States Code has not been enacted as positive law, we will generally refer to the underlying provisions of the INA, while also supplying the corresponding citation to title 8. That is consistent with how the IJs refer to these provisions, and it is also how they are referenced in the regulations. The text of the INA, as amended, is available on the website of the U.S. Government Publishing Office. *See* https://www.govinfo.gov/content/pkg/COMPS-1376/pdf/COMPS-1376.pdf.

*See* 8 U.S.C. § 1225(b)(1). Accordingly, two days after being apprehended, and while he was still in DHS custody, Mendoza-Linares was interviewed by a Spanish-speaking immigration officer. He admitted that he had entered the United States illegally on February 10, without inspection and without entry documents. He stated that he had left El Salvador in order to be with his girlfriend, who lived in Vista, California. Mendoza-Linares answered "No" when asked whether he had "any fear or concern about being returned" to El Salvador and whether he would "be harmed" if returned there.

Based on these responses, the immigration officer immediately made a formal written determination that (1) Mendoza-Linares was an immigrant who at the time he sought to enter the United States lacked a valid entry document; and (2) as a result, he was inadmissible under INA § 212(a)(7)(A)(i)(I). *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I) (stating, *inter alia*, that an immigrant who lacks a "valid entry document" at the "time of application for admission" is "inadmissible"); *see also id.* § 1225(a)(1) (providing that an alien "who arrives in the United States" is "deemed" to be "an applicant for admission"). And because Mendoza-Linares had expressed no fear about being returned to El Salvador, the officer proceeded to issue, with his supervisor's approval, a formal written order of removal under § 235(b)(1) on February 12, 2020. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (stating that, upon determining that an arriving alien is inadmissible under § 212(a)(7) [8 U.S.C. § 1182(a)(7)], "the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [INA § 208, 8 U.S.C. § 1158] or a fear of persecution"); *see also* 8 C.F.R. § 235.3(b)(7) ("Any removal order entered by an examining immigration officer pursuant to section 235(b)(1) of the Act

must be reviewed and approved by the appropriate supervisor before the order is considered final."); *id.* § 1235.3(b)(7) (same).

It appears, however, that Mendoza-Linares subsequently did express fear about being returned to El Salvador, although the record is unclear as to when and how he did so. Instead of executing the expedited removal order, DHS on February 21 provided Mendoza-Linares with an "orientation" describing the "credible fear" review process that applies when aliens, during their initial screening, indicate fear of returning to their home country. *See* 8 U.S.C. § 1225(b)(1)(A)(ii) (providing that, if an alien "indicates either an intention to apply for asylum" or "a fear of persecution" during initial screening, then "the officer shall refer the alien for an interview by an asylum officer under subparagraph (B)"). Thus, although Mendoza-Linares had not expressed fear of being returned to El Salvador during his initial screening interview and although an order of removal had already been entered against him, he was nonetheless referred to an asylum officer, who on March 31, 2020 conducted a "credible fear" interview as described in INA § 235(b)(1)(B). *See* 8 U.S.C. § 1225(b)(1)(B).

Under that provision, the asylum officer must conduct an interview for the purpose of determining whether the alien has a "credible fear of persecution," *i.e.*, whether "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum" under INA § 208. *See* 8 U.S.C. § 1225(b)(1)(B)(v).[2]  Although the

---

[2] Under INA § 208, asylum is generally available to an alien who establishes "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or

statutory standard speaks solely in terms of asylum, the applicable regulations go further and direct the asylum officer also to assess whether the alien might be eligible for withholding of removal under § 241(b)(3) of the INA or for relief under the Convention Against Torture.  *See* 8 C.F.R. § 208.30(e)(2), (3), (5) (2020).

During his credible fear interview with an asylum officer, Mendoza-Linares stated that he was afraid that he would be harmed by gangs if he was returned to El Salvador. Mendoza-Linares said that he had worked as a DJ at parties, that some of his clients were politicians, and that at such events the clients would require him to repeat their message that "the government or the candidate was against the gangs."  That, he said, led to a half-dozen incidents of assaults by gang members, including throwing rocks or shooting at a bus he was riding.  Mendoza-Linares also recounted two incidents in which a wall poster advertising his DJ business was defaced with gang symbols, and he was beaten or threatened after he erased the symbols.  He additionally told the asylum officer that, although he did not have any gang tattoos, he was worried that his tattoos— which consisted of a coy fish, his daughter's name, bar codes with his and his daughter's birthdays, and the comedy/tragedy "theater" faces—would be mistaken for gang tattoos.

After the interview, the asylum officer determined on April 1, 2020 that Mendoza-Linares did not have a credible fear of persecution or a credible fear of torture.  In accordance with § 235(b)(1)(B)(iii)(II), the officer made a

---

political opinion."  8 U.S.C. § 1101(a)(42)(A); *id.* § 1158(b)(1)(A) (establishing this definition as the general standard for asylum).  There are also, however, numerous statutory bars that may preclude particular aliens from receiving asylum.  *See*, *e.g.*, 8 U.S.C. § 1158(b)(2).

written record setting forth his "analysis of why, in the light of such facts, the alien has not established a credible fear of persecution." 8 U.S.C. § 1225(b)(1)(B)(iii)(II); *see also* 8 C.F.R. § 208.30(e)(1). Using a standard agency form (I-870), the asylum officer determined that Mendoza-Linares was credible, but that "[n]o fear of persecution or torture [had been] established."

In the narrative section of the form, the officer first explained that Mendoza-Linares was "barred from asylum pursuant to 8 CFR 208.13(c)(4)"; that he therefore had "not established a significant possibility of establishing eligibility for asylum"; and that, consequently, he "received a negative credible fear of persecution determination." The regulatory reference was to the so-called "Transit Bar," a then-operative interim regulation at 8 C.F.R. § 208.13(c)(4) (2020),[3] which provided that, subject to certain enumerated exceptions, an alien (such as Mendoza-Linares) who arrived in the U.S. across the southern border "after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States" is categorically ineligible for asylum. A companion interim regulation promulgated at the same time provided that, if an asylum officer concluded that an alien was subject to the Transit Bar and was therefore ineligible for asylum, "then the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum." 8 C.F.R. § 208.30(e)(5)(iii). These regulations were promulgated on July 16, 2019, *see* 84 Fed. Reg. 33829 (2019), and after an initial injunction against their enforcement was stayed by the Supreme Court, they were operative on the day that the asylum officer made the negative credible fear determination and thereafter

---

[3] All references to regulations are to the 2020 versions that were in effect at the time of Mendoza-Linares's proceedings.

continuously through the day on which Mendoza-Linares filed his petition for review in this court.[4]

The asylum officer further found that Mendoza-Linares had failed to establish a "potential entitlement to withholding under INA 241 or CAT [Convention Against Torture] protection." Under the then-applicable regulations, if an alien is subject to the Transit Bar and therefore ineligible for asylum, the asylum officer must nonetheless consider whether the alien has established a "*reasonable fear* of persecution or torture," but only for purposes of determining eligibility "for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of

---

[4] Shortly after the issuance of these regulations, a district court issued a nationwide injunction against their enforcement. *See East Bay Sanctuary Covenant v. Barr*, 391 F. Supp. 3d 974, 985 (N.D. Cal. 2019). However, prior to the asylum officer's determination in this case, the Supreme Court stayed that injunction "in full pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such writ is sought." *Barr v. East Bay Sanctuary Covenant*, 140 S. Ct. 3, 3 (2019). In a separate lawsuit, another district court enjoined enforcement of the Transit Bar against a defined subclass of persons who had "arrived at the southern border seeking asylum before July 16, 2019," and a motions panel of this court denied a motion to stay that injunction. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1003 (9th Cir. 2020). But because Mendoza-Linares had arrived well after July 16, 2019, the asylum officer in this case concluded that Mendoza-Linares was not a member of the class in *Al Otro Lado*, and so the injunction in that case did not apply here. Accordingly, no injunction barred application of the regulation in Mendoza-Linares's case at the time the asylum officer made his determination. Twenty-two days after Mendoza-Linares filed his petition for review in this court, a district court subsequently vacated the regulations after holding that they had been issued in violation of the notice-and-comment requirements of the Administrative Procedure Act. *See Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 57, 60 (D.D.C. 2020), *appeal dismissed as moot sub nom. I.A. v. Garland*, 2022 WL 696459, at *1 (D.C. Cir. 2022).

removal under the Convention Against Torture."  8 C.F.R. § 208.30(e)(5)(iii) (emphasis added).  That "reasonable fear" standard matches the one applied under the regulations governing the expedited screening of aliens who, under INA § 241(a)(5), have had a previously executed removal order reinstated against them and who are statutorily ineligible for asylum.  *See* 8 C.F.R. § 208.31(a), (c); *see Alvarado-Herrera v. Garland*, 993 F.3d 1187, 1190–92, 1195 (9th Cir. 2021) (describing the "reasonable fear" screening process applicable to aliens subject to reinstated removal orders).  An alien has a "reasonable fear" of persecution or torture if he or she establishes "a 'reasonable possibility' of persecution or torture, which has been defined to require a ten percent chance that the non-citizen will be persecuted or tortured if returned to his or her home country."  *Alavarado-Herrera*, 993 F.3d at 1195 (quoting 8 C.F.R. § 208.31(c) and citing *Bartolome v. Sessions*, 904 F.3d 803, 809 (9th Cir. 2018)).  The asylum officer concluded that the requisite reasonable possibility of persecution or torture did not exist in Mendoza-Linares's case.

As we have noted, this "reasonable fear screening standard 'is the same standard required to establish a 'well-founded fear' of persecution in the asylum context.'"  *Bartolome*, 904 F.3d at 809 n.4 (citation omitted).  The upshot is that, in order to establish a "reasonable fear of persecution" sufficient to warrant further consideration for withholding of removal, an alien in expedited removal proceedings must satisfy the same standard that is used in evaluating *substantive* eligibility for asylum.  The practical effect of the Transit Bar is thus to raise the standard of proof that an alien must satisfy to avoid expedited removal.  An alien can avoid expedited removal by showing "a significant possibility . . . that the alien could establish eligibility for asylum," 8 U.S.C. § 1225(b)(1)(B)(v), and if the alien is *not* subject to the Transit Bar, then that standard would be

satisfied (assuming no other bar to asylum relief applies) if the alien *establishes a significant possibility that he or she could show* a well-founded fear of persecution. *See supra* note 2. But if the Transit Bar applies, the alien must instead *show* a well-founded fear of persecution (or a reasonable fear of torture). Thus, the asylum officer here only found that Mendoza-Linares had not shown a well-founded fear of persecution; he did not make a finding as to whether there was a "significant possibility" that Mendoza-Linares could make that showing at a full-blown asylum hearing.

A supervisory official approved the asylum officer's determination, as required by 8 C.F.R. § 208.30(e)(8). Because a removal order had already been issued prior to the initiation of the credible-fear review process, the effect of the asylum officer's actions was to uphold and adopt that expedited removal order.

Mendoza-Linares sought review of the asylum officer's negative credible fear determination by an IJ pursuant to INA § 235(b)(1)(B)(iii)(III). *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III); *see also* 8 C.F.R. § 208.30(e)(5)(iii), (g). The IJ heard testimony on May 28, 2020 and upheld the asylum officer's determination the same day. Reviewing de novo, the IJ determined that Mendoza-Linares was ineligible for asylum under the Transit Bar, and the IJ therefore did not further consider whether he would otherwise have been eligible for asylum. The IJ then separately determined that Mendoza-Linares had not "established a reasonable fear of persecution or torture that would entitle [him] to withholding of removal or protection under the Convention Against Torture." In his oral ruling, the IJ explained that he thought that the asylum officer had erred in concluding that the past harm Mendoza-Linares alleged did not rise to the level of persecution. Nonetheless, the IJ concluded that Mendoza-Linares's fear of gang

violence lacked a connection to a protected ground and reflected "problems that were similar to other individuals in El Salvador." Had the IJ found the applicable standard to have been satisfied, the IJ would have been required to "vacate" the expedited removal order. 8 C.F.R. § 1208.30(g)(2)(iv)(B). But because the IJ instead upheld the asylum officer's determinations, the effect of the IJ's order was to return the matter to DHS "for removal of the alien," without further administrative appeal. *Id*. § 1208.30(g)(2)(iv)(A) ("The immigration judge's decision is final and may not be appealed."); *see also* 8 U.S.C. § 1225(b)(1)(C) (generally barring "administrative appeal" of IJ decisions in credible-fear review cases).

On June 8, 2020, Mendoza-Linares filed a petition for review in this court, seeking review of the expedited removal order and the IJ's determination.

**II**

Mendoza-Linares argues that, because the asylum officer and the IJ relied on the Transit Bar in finding that he lacked a credible fear of persecution, he was denied, without due process, his statutory rights under § 235 of the INA. However, we cannot reach the merits of these issues if the Government is correct in its threshold contention that we lack subject matter jurisdiction to consider Mendoza-Linares's petition for review. "Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (citation and internal quotation marks omitted). "There is no dispute that the Constitution permits Congress to extend federal court jurisdiction to a case such as this one; the question is whether Congress has done so." *Id*. at 256–57 (citations omitted). Because "a federal court always has jurisdiction to determine its own jurisdiction," *United States*

*v. Ruiz*, 536 U.S. 622, 628 (2002), we have the authority to resolve the parties' dispute as to whether Congress has granted us jurisdiction here. As explained below, the answer to that question is no.

**A**

Under INA § 242(a)(1), we generally have jurisdiction to review "a final order of removal." 8 U.S.C. § 1252(a)(1); *see also id*. § 1252(b)(2). However, subsection (a)(1) is immediately followed by a further subsection— § 242(a)(2)—that specifies, as its caption states, certain "[m]atters not subject to judicial review." *Id*. § 1252(a)(2).[5] Section 242(a)(2), in turn, contains four subparagraphs, designated (A)–(D). The first three subparagraphs enumerate three specific categories of matters as to which judicial review is limited, and the fourth subparagraph provides a rule of construction for determining the scope of the limitations set forth in those subparagraphs or elsewhere in the INA. *See id*. § 1252(a)(2)(A)–(D). As described in their subparagraph headings, those three categories are (A) "Review relating to section 235(b)(1) [8 U.S.C. § 1225(b)(1)]"; (B) "Denials of discretionary relief"; and (C) "Orders against criminal aliens." *Id*. § 1252(a)(2)(A)– (C). The first category, in subparagraph (A), is the one that is relevant here. The text of subparagraph (A), together with the text of the rule of construction in subparagraph (D), is as follows:

---

[5] Section 242(a)(1) also contains a parenthetical that excludes from its grant of jurisdiction "an order of removal without a hearing pursuant to section 235(b)(1) [8 U.S.C. § 1225(b)(1)]." 8 U.S.C. § 1252(a)(1). Given that we conclude that, for other reasons, we plainly lack jurisdiction over Mendoza-Linares's petition for review, we express no view as to whether the Government is correct in its contention that this same result is alternatively required by that parenthetical exclusion.

**(A) Review relating to section 235(b)(1).**

Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—

(i) except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 235(b)(1) [8 U.S.C. § 1225(b)(1)],

(ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of such section,

(iii) the application of such section to individual aliens, including the determination made under section 235(b)(1)(B) [8 U.S.C. § 1225(b)(1)(B)], or

(iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of section 235(b)(1) [8 U.S.C. § 1225(b)(1)].

. . .

**(D) Judicial review of certain legal claims.**

Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for

review filed with an appropriate court of appeals in accordance with this section.

8 U.S.C. § 1252(a)(2)(A), (D).

Because several of the prohibitions on judicial review in § 242(a)(2)(A) are expressly made subject to § 242(e), the scope of jurisdiction over expedited removal orders under § 242 requires consideration of both (1) the limitations set forth in § 242(a)(2)(A); and (2) the exception provided in § 242(e).  We discuss those in turn.

**B**

The plain text of subparagraph (A) comprehensively bars judicial review of matters relating to expedited removal orders under § 235(b)(1), "except as provided in subsection (e)," which provides only for very limited challenges in an appropriate district court.  *Id*. § 1252(a)(2)(A)(i), (ii), (iv); *see also Guerrier*, 18 F.4th at 308 (citing *Alvarado-Herrera*, 993 F.3d at 1192).  Subparagraph (A) accomplishes this result by enumerating four categories of matters relating to expedited removal orders that, taken together, cover every aspect of the expedited removal process.  Except as provided in § 242(e), subparagraph (A)(iv) bars judicial review of any challenge to the "*procedures and policies* adopted by the Attorney General to implement the provisions of section 235(b)(1)," and subparagraph (A)(ii) bars judicial review of "a decision by the Attorney General to *invoke* the provisions of such section" in a given case.  8 U.S.C. § 1252(a)(2)(A)(ii), (iv) (emphasis added).[6]  Once the

_____

[6] Although the various subparagraphs in § 242(a)(2)(A) refer to the "Attorney General," many of the relevant functions have been transferred to DHS, and to that extent the reference to the Attorney General would be understood as a reference to DHS.  *See* 6 U.S.C. § 557; *see also M.M.V. v. Garland*, 1 F.4th 1100, 1105 n.1 (D.C. Cir. 2021).  As

expedited removal procedure in § 235(b)(1) has been invoked, subparagraph (A)(iii) precludes any judicial review of "the *application* of such section to *individual aliens*, including the [credible fear] determination made under section 235(b)(1)(B)." *Id*. § 1252(a)(2)(A)(iii). Notably that subparagraph—unlike the other three—is not subject to the proviso "except as provided in subsection (e)," and it therefore stands as a flat prohibition on any judicial review of such matters. *Compare id*. § 1252(a)(2)(A)(i), (ii), (iv) (including that proviso) *with id*. § 1252(a)(2)(A)(iii) (omitting that proviso). Finally, subparagraph (A)(i) states that, except as provided in § 242(e), no court has jurisdiction to review "any individual determination[,] or to entertain any other cause or claim[,] arising from or relating to *the implementation or operation of an order of removal* pursuant to section 235(b)(1)." *Id*. § 1252(a)(2)(A)(i) (emphasis added). Accordingly, § 242(a)(2)(A)'s general prohibition on judicial review covers the "procedures and policies" that have been adopted to "implement" the expedited removal process; the decision to "invoke" that process in a particular case; the "application" of that process to a particular alien; and the "implementation" and "operation" of any expedited removal order. Congress could scarcely have been more comprehensive in its articulation of the general prohibition on judicial review of expedited removal orders. *See Guerrier*, 18 F.4th at 313 ("Congress chose to strictly cabin this court's jurisdiction to review expedited removal orders.").

---

noted earlier, the expedited removal process involves functions performed by both asylum officers (in DHS) and IJs (in the U.S. Department of Justice ("DOJ")), and it is therefore unsurprising that the regulations implementing the Transit Bar in the context of expedited removal orders were jointly issued by both DHS and DOJ. *See* 84 Fed. Reg. at 33831–32.

By its terms, § 242(a)(2)(A) thus prohibits us from exercising jurisdiction over Mendoza-Linares's petition. By challenging the credible fear determination made in Mendoza-Linares's case, and the standards that were employed by the asylum officer and the IJ in applying section 235(b)(1) to him, Mendoza-Linares necessarily asks us to do what the statute forbids us to do, which is to review "the application of such section to [him]." 8 U.S.C. § 1252(a)(2)(A)(iii). Specifically, his claims that the Transit Bar should not have been applied during his expedited removal proceedings under § 235(b)(1), and that the resulting expedited removal order is legally and factually deficient, necessarily challenge "the application of such section to [him], including the determination made under section 235(b)(1)(B) [8 U.S.C. § 1225(b)(1)(B)]." *Id*. § 1252(a)(2)(A)(iii); *see also id*. § 1225(b)(1)(B) (setting forth the process for making and reviewing the "determination" whether the alien has a "credible fear of persecution"). Under the plain language of § 242(a)(2)(A)(iii), judicial review of such matters is barred. As we have squarely held, "[j]udicial review of an expedited removal order, including the merits of a credible fear determination, is . . . expressly prohibited by § 1252(a)(2)(A)(iii) [INA § 242(a)(2)(A)(iii)]." *Singh v. Garland*, 982 F.3d 778, 782 (9th Cir. 2020). Moreover, as noted earlier, the exception in § 242(e) does not apply to the prohibition on judicial review in § 242(a)(2)(A)(iii). Because that jurisdictional bar in § 242(a)(2)(A)(iii) applies to the entirety of Mendoza-Linares's petition for review, we lack jurisdiction over it.[7]

---

[7] Further, as explained in the next section, § 242(e) has no applicability here even if it were an exception to the jurisdictional bar in § 242(a)(2)(A)(iii).

**C**

To the extent that § 242(e) provides an exception to the jurisdictional bars in § 242(a)(2)(A), that exception is inapplicable here.

Mendoza-Linares's petition for review might conceivably have been viewed as challenging a "procedure[] and polic[y] adopted by the Attorney General to implement the provisions of section 235(b)(1) [8 U.S.C. § 1225(b)(1)]," § 1252(a)(2)(A)(iv), inasmuch as his petition might have been thought to rest on the asserted invalidity of the particular interim regulation requiring that a negative credible fear determination must be made in expedited removal proceedings whenever the Transit Bar applies. *See* 8 C.F.R. § 208.30(e)(5)(iii). Because the separate, more specific prohibition of judicial review of such procedures and policies in § 242(a)(2)(A)(iv) *is* subject to the exception in § 242(e), it could then be argued that, to the extent that Mendoza-Linares's petition raised such a challenge, the applicability of that exception in § 242(e) must still be considered. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (holding that, under the canon of "statutory construction that the specific governs the general," a more "specific prohibition or permission" prevails over a "general permission or prohibition" to the extent of any conflict). However, for multiple reasons, § 242(e) does not help Mendoza-Linares.

**1**

As an initial matter, § 242(e) only authorizes two limited forms of judicial review of matters concerning expedited removal—namely, (1) a very limited form of judicial review in "[h]abeas corpus proceedings"; and (2) review of certain "[c]hallenges on [the] validity of the system," which must be

brought exclusively as "an action instituted in the United States District Court for the District of Columbia." 8 U.S.C. § 1252(e)(2), (3) (headings). The limited authorization of "habeas corpus proceedings" does not grant *this court* jurisdiction over Mendoza-Linares's petition for review brought under § 242(a)(1) because habeas proceedings must be instituted in the appropriate district court and not in the first instance in this court, *see* Fed. R. App. P. 22(a), and because a petition for review in this court under § 242(a)(1) is distinct from a habeas corpus petition, *see* 8 U.S.C. § 1252(a)(5). And, of course, a limited grant of jurisdiction to the D.C. district court does not confer any jurisdiction on this court. *See Singh*, 982 F.3d at 783.

However, if Mendoza-Linares's petition for review could properly be characterized as invoking the limited jurisdiction conferred on an appropriate district court under § 242(e), we would have jurisdiction and discretion to transfer the matter to such district court. *See Garcia de Rincon v. Dep't of Homeland Sec.*, 539 F.3d 1133, 1140–41 (9th Cir. 2008). But as we held in *Garcia de Rincon*, we may not transfer a matter under § 242(e) if the transferee district court would lack jurisdiction under that section. *See id*. at 1141. As explained in the next two sections, that is the case here.

**2**

We cannot transfer the matter to the D.C. district court, because it is clear that such court would lack jurisdiction under § 242(e). As an initial matter, Mendoza-Linares has failed to preserve any substantive challenge that would fall within the limited grant of jurisdiction to the D.C. district court. That court has jurisdiction to determine "whether . . . a regulation . . . issued by or under the authority of the Attorney General to implement such section [235(b)(1)] is

not consistent" with the INA or "is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A)(ii). As noted earlier, that language arguably extends to § 208.30(e)(5)(iii), which specifically requires a negative credible fear determination in expedited removal proceedings when the Transit Bar applies. But Mendoza-Linares has pointedly declined to challenge *that* regulation and has instead confined his challenge *only* to the underlying Transit Bar itself, which is contained in separate regulations that govern asylum more generally and not merely in the expedited removal process. *See* 8 C.F.R. §§ 208.13(c)(4), 1208.13(c)(4). And Mendoza-Linares did that precisely to avoid falling within § 242(e)(3)'s requirement that any such challenge to a regulation implementing the expedited removal process must be brought in the D.C. district court. As his brief correctly explains, we held in *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021), that the underlying Transit Bar regulation in 8 C.F.R. §§ 208.13(c)(4), 1208.13(c)(4) constitutes a freestanding *substantive* limitation on the granting of asylum and is therefore not a regulation that is "entirely linked" to the expedited removal process and therefore is not within the exclusive jurisdiction conferred on the D.C. district court under § 242(e)(3)(A). *East Bay*, 993 F.3d at 666–67. Because Mendoza-Linares has affirmatively waived any challenge to any regulation implementing § 235(b)(1), the exception in § 242(e) permitting challenges in the D.C. district court cannot apply here.

Even if Mendoza-Linares's petition had preserved such a claim, the D.C. district court would still lack jurisdiction for other reasons, thereby precluding us from transferring the matter there. Any such action in the D.C. district court under § 242(e)(3) is subject to strict jurisdictional limitations that Mendoza-Linares cannot satisfy. Specifically, any such action "must be filed no later than 60 days after the date the

challenged . . . regulation . . . is first implemented," *see* 8 U.S.C. § 1252(e)(3)(B), and that "statutory time limit begins to run" when the regulation or written policy "is 'first implemented,' *not when it is first applied to specific facilities or aliens.*" *M.M.V.*, 1 F.4th at 1109 (emphasis added); *see also Singh*, 993 F.3d at 783 (same). Moreover, that time limit "is jurisdictional" and is "not subject to tolling," *M.M.V.*, 1 F.4th at 1109; indeed, it does not permit late plaintiffs to join an already existing timely action in the D.C. district court (if there is one), *see id*. at 1111.

**3**

Nor can we transfer Mendoza-Linares's petition to the Southern District of California, which is the district court that all parties agree would have had venue over a habeas corpus petition.

The narrow habeas corpus authority granted by § 242(e)(2) is expressly "limited to determinations" of three issues: (1) "whether the petitioner is an alien"; (2) "whether the petitioner was ordered removed under such section," *i.e.*, § 235(b)(1); and (3) "whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien" who has *already* been granted a still-valid status as a lawful permanent resident, a refugee, or an asylee. 8 U.S.C. § 1252(e)(2)(A)–(C) (emphasis added); *see also Thuraissigiam*, 140 S. Ct. at 1966. Mendoza-Linares concedes that he is an alien and that he has not been granted status as a lawful permanent resident, refugee, or asylee. The only question the parties dispute in this regard is whether Mendoza-Linares has raised a sufficient question as to whether he "was ordered removed under such section" 235(b)(1) within the meaning of § 242(e)(2)(B), so as to

warrant transfer to the Southern District of California.[8]  The answer to that question is clearly no.

Paragraph (5) of § 242(e) explicitly defines the scope of the inquiry that is allowed by § 242(e)(2)(B)'s statement that a habeas court has jurisdiction to determine "whether the petitioner was ordered removed under such section" 235(b)(1).  Specifically, paragraph (5) states:

> In determining whether an alien has been ordered removed under section 235(b)(1) [8 U.S.C. § 1225(b)(1)], the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner.  There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

8 U.S.C. § 1252(e)(5).  This language is fatal to Mendoza-Linares's argument that he may invoke the habeas jurisdiction of the Southern District and that we should therefore transfer the matter to that court.  There is no doubt that an order "under section 235(b)(1)" was in fact issued here, because (1) the order that is in the record and that Mendoza-Linares challenges expressly states that it was entered "under section 235(b)(1)" of the INA; (2) that order was initially issued under § 235(b)(1)(A)(i), after Mendoza-Linares originally stated that he was not afraid to return to El Salvador; and (3) that order was subsequently upheld and adopted by the asylum officer under § 235(b)(1)(B)(iii)(I) after Mendoza-Linares's credible fear interview with the asylum officer.  *See supra* at 3–10.  And there is no doubt

---

[8] Mendoza-Linares initially conceded in his opening brief that INA § 242(e)(2) did *not* grant jurisdiction over the issues he raises here and changed his position only after we requested supplemental briefing concerning jurisdiction.

that the order "relates to" Mendoza-Linares. Consequently, there is no basis for invoking the habeas jurisdiction of the Southern District and therefore no basis for a transfer to that court.

Mendoza-Linares nonetheless contends that § 242(e)(2)(B) grants the Southern District jurisdiction to consider whether, despite his removal order's express invocation of § 235(b)(1), that order was *in substance* really an expedited removal order under § 235(b)(1). It was not, according to Mendoza-Linares, because—due to the application of the Transit Bar—his credible fear of persecution was assertedly not evaluated under the correct standards set forth in the INA. *See supra* at 5–10. This argument is refuted by the second sentence of § 242(e)(5). That sentence states that, in determining whether an order under § 235(b)(1) was in fact issued, a habeas court lacks jurisdiction to review "whether the alien [1] is actually inadmissible or [2] entitled to any relief from removal." 8 U.S.C. § 1252(e)(5). Those are the two substantive determinations that go into the issuance of an order under § 235(b)(1) in any given case, *see id.* § 1225(b)(1)(A), (b)(1)(B)(iii), and a habeas court is expressly barred from reviewing whether they were correct. Further, as noted earlier, the prohibition in § 242(a)(2)(A)(iii) on judicial review of "the application of such section [235(b)(1)] to individual aliens, including the [credible fear] determination made under section 235(b)(1)(B)" is expressly *not* subject to the proviso "except as provided in subsection (e)," which is found in each of the other subparagraphs in § 242(a)(2)(A). *See supra* at 13–14. It follows that the jurisdictional bar in § 242(a)(2)(A)(iii) also applies to the habeas jurisdiction in § 242(e)(2) and precludes the sort of substantive inquiry that Mendoza-Linares seeks.

Moreover, Mendoza-Linares's argument fails on its own terms.   As Mendoza-Linares notes, and as we have previously held, the Transit Bar is a general substantive rule concerning asylum and is *not* a rule that implements § 235(b)(1).  *See East Bay*, 993 F.3d at 666–67.  The rule was in effect at the time that the asylum officer and the IJ acted, *see supra* at 6–7 & n.4, and as a substantive rule about the availability of asylum, it was taken into account by them in making the determination, under § 235(b)(1), whether "there is a significant possibility" that Mendoza-Linares "could establish eligibility for asylum" under the INA. 8 U.S.C. § 1225(b)(1)(B)(v) (defining "credible fear of persecution").  The asylum officer and the IJ thus made a determination, based on the Transit Bar, that there was not the requisite "significant possibility" of eligibility for asylum, and in light of that determination, Mendoza-Linares's expedited removal order was plainly issued "under section 235(b)(1)."

Because it is clear that the agency entered an expedited removal order under § 235(b)(1), the limitations in § 242(e) bar judicial review of the merits of the determinations underlying that order.   Indeed, overwhelming precedent confirms this point.  *See Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 917 F.3d 1097, 1103–04 & n.5 (9th Cir. 2019) (rejecting the contention that § 242(e) should be construed to allow merits review of expedited removal orders, holding that "the plain language of the statute . . . evidences Congress' intent" to "strip judicial review to 'police the boundaries'" of the expedited removal statute), *rev'd on other grounds*, 140 S. Ct. at 1959; *id.* at 1110 (explicitly "reject[ing] the argument that § 1252(e)(2) [INA § 242(e)(2)] provides jurisdiction over claims of legal error" in expedited removal proceedings); *Smith v. U.S. Customs & Border Prot.*, 741 F.3d 1016, 1021 n.4, 1022 (9th Cir. 2014) (holding that the "jurisdiction-stripping" provisions of

§ 242(e) do not permit a court to "evaluate the merits" of the determinations underlying an expedited removal order); *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1082 (9th Cir. 2011) (holding that "a court's habeas jurisdiction" under § 242(e)(2) "does not extend to review of the claim that an alien was wrongfully deprived of the administrative review permitted under the statute and applicable regulations"); *Garcia de Rincon*, 539 F.3d at 1139 (holding that § 242(e) "expressly limit[s] the scope of [judicial] review to habeas petitions alleging that the petitioner is not an alien or was never subject to an expedited removal order"). As the Third Circuit explained in *Castro v. U.S. Dep't of Homeland Sec.*, 835 F.3d 422 (3d Cir. 2016), judicial review of an expedited removal under § 242(e)(2)(B), as clarified by § 242(e)(5), is limited to determining "whether an immigration officer issued that piece of paper and whether the Petitioner is the same person referred to in that order." *Id*. at 431 (citation omitted); *see also Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 819 n.16 (9th Cir. 2004) (stating that, under § 242(e)(5), a habeas court applying § 242(e)(2)(B) "may only ask whether there was a removal order and whether it relates to the petitioner"); *Shunaula v. Holder*, 732 F.3d 143, 146 (2d Cir. 2013) (holding that the "jurisdictional bar" of § 242 precludes judicial review of a claim of "illegality in the Attorney General's particular decision to remove" an alien under the expedited removal statute).

Because Mendoza-Linares has no colorable basis for invoking the very limited habeas jurisdiction in § 242(e)(2), the Southern District would lack jurisdiction over this matter, and a transfer to that court is not available. *See Garcia de Rincon*, 539 F.3d at 1141. Because no exception in § 242(e) applies, the jurisdiction bar in § 242(a)(2)(A)

governs this case, and we must dismiss the petition for review.[9]

**D**

Mendoza-Linares nonetheless argues that, despite the clarity and comprehensiveness of § 242's limits on judicial review of expedited removal orders, we must construe that statute as *not* precluding judicial review of a colorable constitutional claim. In making this argument, Mendoza-Linares invokes the interpretive principle that "where Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988); *see also Center for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019). This clear statement rule rests on, and is an application of, the canon of constitutional avoidance: "The *Webster* Court noted that this heightened showing was required to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 9 (2012) (citations and internal quotation marks omitted). Contrary to what Mendoza-Linares contends, these canons of construction do not require a different conclusion here.

In response to the Supreme Court's decisions in *INS v. St. Cyr*, 533 U.S. 289 (2001), and *Calcano-Martinez v INS*,

---

[9] Mendoza-Linares argues that, if we were to grant his petition as to his potential eligibility for asylum, we should likewise assert jurisdiction to vacate the adverse administrative determinations in his case as to withholding of removal and protection under the Convention Against Torture. But Mendoza-Linares presents no serious argument that these latter determinations escape the jurisdiction bar of § 242, and they plainly do not.

533 U.S. 348 (2001), which invoked such canons in upholding habeas jurisdiction over certain challenges to removal orders, Congress amended the INA by adding a provision that *expressly* addresses the court's jurisdiction over constitutional questions and questions of law in removal cases, namely, § 242(a)(2)(D). *See* 8 U.S.C. § 1252(a)(2)(D). That provision makes unambiguously clear that § 242(a)(2) and § 242(e) bar judicial review of constitutional challenges to expedited removal orders.

In *St. Cyr*, the BIA upheld an IJ's denial of St. Cyr's request for a discretionary waiver of removal under former § 212 of the INA, concluding that recent amendments to the INA rendered St. Cyr categorically ineligible for relief. *See St. Cyr v. INS*, 229 F.3d 406, 408–09 (2d Cir. 2000). Several months later, St. Cyr filed a habeas corpus petition challenging the retrospective application of the INA amendments to his case. *Id*. at 409. The district court accepted jurisdiction and granted relief, and the Second Circuit affirmed. *St. Cyr*, 533 U.S. at 293. In the Supreme Court, the Government argued that the INA precluded any judicial review of the determination that St. Cyr was categorically ineligible for a § 212 waiver. *Id*. at 297–98. The Court agreed that the then-existing version of the INA precluded St. Cyr from filing a petition for review under § 242(a)(1) challenging the BIA's decision, but the Court held that habeas review nonetheless remained available. *Id*. at 313–14. The Court noted that, in challenging the retroactive application of the amendments concerning § 212 waiver authority, St. Cyr's habeas petition "raise[d] a pure question of law," and the Court held that a construction of the INA "that would entirely preclude review of a pure question of law by any court would give rise to substantial constitutional questions." *Id*. at 298, 300. Under the canon of constitutional avoidance, the Court held, such a reading of the INA should not be adopted absent "a clear and

unambiguous statement of congressional intent" to foreclose habeas jurisdiction. *Id*. at 305. The Court ultimately concluded that such a clear statement was lacking. *Id*. at 314.

In the companion case of *Calcano-Martinez*, the Court reached a similar conclusion in the context of two aliens who sought to challenge the same retroactive application of the amendments concerning § 212 waiver authority. *See* 533 U.S. at 349. In a footnote, the Court specifically noted the Government's concession that, under the canon of constitutional avoidance, the INA's limitation on review of removal orders involving criminal aliens, *see* 8 U.S.C. § 1252(a)(2)(C), should not be construed as precluding "jurisdiction to review 'substantial constitutional challenges' raised by aliens." 533 U.S. at 350 n.2 (citation omitted); *see also Demore v. Kim*, 538 U.S. 510, 517 (2003) (applying, in the context of the INA's limitation on judicial review of determinations concerning bail and detention, the canon of construction that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear" (quoting *Webster*, 486 U.S. at 603)).

In response to *St. Cyr* and *Calcano-Martinez*, Congress amended the judicial review provisions in INA § 242 in two key respects. *See* REAL ID Act, Pub. L. No. 109-13, Div. B, § 106(a), 119 Stat. 302, 310 (2005); *see also Patel v. Garland*, 142 S. Ct. 1614, 1623 (2022). First, Congress added clarifying language stating that, except as provided in § 242(e), any use of habeas corpus to challenge removal orders is precluded, and a petition for review in the court of appeals is "the sole and exclusive means for judicial review" of such orders. *See* 8 U.S.C. § 1252(a)(2), (5), (b)(9). Second, Congress also added language specifically addressing the clear statement rules that had been referenced and applied in *St. Cyr* and *Calcano-Martinez*. On this

subject, Congress added a new subparagraph (D) to § 242(a)(2) that provides the following rule of construction for interpreting the INA's prohibitions on judicial review:

**(D) Judicial review of certain legal claims.**

> Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

Pub. L. No. 109-13, Div. B, § 106(a)(1)(A)(iii); *see also* 8 U.S.C. § 1252(a)(2)(D).

On its face, this statutory rule of construction identifies those provisions "limit[ing] or eliminat[ing] judicial review" that are not to "be construed as precluding review of constitutional claims or questions of law." *Id.* Those provisions are: (1) "subparagraph (B)" of § 242(a)(2); (2) "subparagraph . . . (C)" of § 242(a)(2); and (3) "any *other* provision of [the INA] (*other* than this section)." *Id.* (emphasis added). The import of this provision is clear and unmistakable. By extending this rule of construction to "any other provision" of the INA beyond § 242(a)(2)(B) and § 242(a)(2)(C), and then expressly stating that this extension does not apply to "this section," § 242(a)(2)(D) establishes that its rule of construction is inapplicable to any provision of § 242 other than the two specifically enumerated subsections. Sections § 242(a)(2)(A) and 242(e)—which are the relevant provisions that "limit[] or eliminate[] judicial review" here—are thus *expressly excluded* from the list of provisions that "shall be construed" as allowing "review of constitutional claims or questions of law."

8 U.S.C. § 1252(a)(2)(D); *see also Guerrier*, 18 F.4th at 308 (holding that § 242(a)(2)(D) '"does *not* apply to the jurisdictional limitations codified elsewhere' in the section, including the aforementioned limitation in subparagraph (A) circumscribing judicial review of expedited removal orders" (quoting *Garcia de Rincon*, 538 F.3d at 1138)); *Singh*, 982 F.3d at 784 (holding that, by its terms, § 242(a)(2)(D) "plainly does not override the prohibition [on jurisdiction] in Subparagraph (A)"). This conclusion is further reinforced by the fact that subparagraphs (B) and (C) each contain the proviso that their jurisdictional limitations apply "except as provided in subparagraph (D)," but that phrase is not included in subparagraph (A). *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

With respect to § 242(a)(2)(A) and § 242(e), Congress has thereby made "clear" its "inten[t] to preclude judicial review of constitutional claims," *Webster*, 486 U.S. at 603, as well as questions of law. *See United States v. Kwai Fun Wong*, 575 U.S. 402, 409–10 (2015) (noting that a clear statement rule is satisfied when "traditional tools of statutory construction . . . plainly show" Congress's intent). Accordingly, § 242(a)(2)(A) and § 242(e) are to be construed in accordance with their broad plain language, even if that precludes review of constitutional claims or questions of law. *See Guerrier*, 18 F.4th at 312–13.

## III

The dissent nonetheless insists that Congress's express exclusion of § 242(a)(2)(A) and § 242(e) from § 242(a)(2)(D)'s rule of construction preserving "review of

constitutional claims" is not clear enough to satisfy *Webster*'s rule that Congress must clearly state its intention to bar review of colorable constitutional claims. To defeat *Webster*'s canon of construction against precluding review of constitutional claims, the dissent says, Congress would have needed to add language that is more *affirmative* in its phrasing, such as adding a clause to § 242(a)(2)(A) "stat[ing] that we lack jurisdiction 'including over [constitutional] claims restored under subparagraph (D)." *See* Dissent at 59. Because there is no such affirmative language, the dissent contends, all of the provisions that Congress specifically excluded from § 242(a)(2)(D)'s preservation of review of constitutional claims must *also* be understood as preserving review of constitutional claims. *See* Dissent at 59. For multiple reasons, the dissent's conclusion makes no sense and contravenes the Supreme Court's admonition that courts "cannot press statutory construction to the point of disingenuous evasion even to avoid a constitutional question." *Miller v. French*, 530 U.S. 327, 341 (2000) (citation and internal quotation marks omitted).

First, the dissent's analysis overlooks the crucial fact that § 242(a)(2)(D) reflects Congress's direct response to a line of Supreme Court decisions applying clear statement rules to preserve judicial review, in removal cases, of constitutional claims and pure questions of law. As the Supreme Court has explained, clear statement rules "facilitate[] a dialogue between Congress and the Court" with respect to any issue as to which the Court has applied such a rule:

> If the Court invokes a clear statement rule to advise that certain statutory interpretations are favored in order to avoid constitutional difficulties, Congress can make an informed legislative choice either to amend the statute or to retain its existing text. *If*

*Congress amends, its intent must be respected even if a difficult constitutional question is presented.* The usual presumption is that Members of Congress, in accord with their oath of office, considered the constitutional issue and determined the amended statute to be a lawful one; and the Judiciary, in light of that determination, proceeds to its own independent judgment on the constitutional question when required to do so in a proper case.

*Boumediene v. Bush*, 553 U.S. 723, 738 (2008) (emphasis added). In a direct response to the Court's holdings that, absent a clear statement, judicial review of constitutional claims and questions of law in removal cases was deemed to be preserved, Congress enacted a provision that explicitly addresses that very subject by specifically demarcating *which* provisions of the INA are to be construed as preserving review of constitutional claims and questions of law—and § 242(a)(2)(A) and § 242(e) were expressly carved out. *See supra* at 26–28. Because Congress made its "informed legislative choice" to amend the INA to address the application of the relevant clear statement rules to the INA's jurisdiction-stripping provisions, "its intent must be respected even if a difficult constitutional question is presented." *Boumediene*, 553 U.S. at 738. By rejecting the line Congress drew, and instead insisting on language that uses affirmative phrasing in denying judicial review of constitutional questions, the dissent seeks "a new rule requiring Congress to provide a *super-clear* statement" on that very same subject. *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1609 (2020) (emphasis added); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) (stating that Congress need not "incant magic words in order to speak clearly").

Second, the dissent's reading effectively reduces § 242(a)(2)(D) to surplusage. In light of the Supreme Court's decisions in *St. Cyr* and *Calcano-Martinez*, had Congress *not* enacted § 242(a)(2)(D) in the REAL ID Act, judicial review of questions of law and of constitutional claims would have remained presumptively preserved. *See Boumediene*, 553 U.S. at 738. The REAL ID Act's channeling provisions would still have eliminated those decisions' reliance on habeas jurisdiction and would instead have consolidated that presumptively preserved judicial review into the courts of appeals' jurisdiction over petitions for review. The result would be that, without § 242(a)(2)(D) being added, the courts of appeal would have received intact the presumptively preserved jurisdiction over constitutional claims and questions of law. But under the dissent's reading, the very same preservation of jurisdiction over constitutional claims that would have obtained had § 242(a)(2)(D) *not* been enacted is one that follows with § 242(a)(2)(D) on the books. According to the dissent's reading, all that § 242(a)(2)(D) did with respect to constitutional claims was to partially (and pointlessly) codify a rule of construction that remains fully applicable to the exact same extent as before. Because the dissent's reading reduces to a nullity § 242(a)(2)(D)'s reference to jurisdiction over "constitutional claims," it cannot be correct. *See Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (stating that, under the "canon against surplusage," "every word and every provision is to be given effect" and "none should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence" (simplified)).

Third, the dissent's reading of § 242(a)(2)(D) has no plausible explanation for Congress's explicit carve-out of § 242(a)(2)(A) and § 242(e). The dissent speculates that perhaps "Congress saw no need to include (A) within subparagraph (D) because it *already* was established,

known, or obvious that constitutional claims in situation (A)—unlike situations (B) and (C)—*could* be reviewed by the court of appeals." *See* Dissent at 59. The dissent was unable to cite anything that would support such an absurd suggestion, which gets things exactly backwards. Subparagraph (A) addresses only expedited removal orders under § 235(b)(1), which are generally applicable only to an alien "who is arriving in the United States." 8 U.S.C. §§ 1225(b)(1)(A)(i), 1252(a)(2)(A). But it has been long settled that "an alien seeking initial admission to the United States requests a privilege *and has no constitutional rights regarding his application*, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (emphasis added); *see also Thuraissigiam*, 140 S. Ct. at 1982. Thus, what is distinctive about subparagraph (A) is that it is limited to precisely the situation in which a denial of judicial review is *least* likely to present constitutional difficulties. The only plausible explanation for Congress's deliberate carve-out of § 242(a)(2)(A) from the preservation of judicial review in § 242(a)(2)(D) is that Congress—which is presumed to know the law, *see Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1072 (2020)—was well aware that the aliens covered by subparagraph (A) have no constitutional rights concerning their applications and therefore could be denied judicial review without constitutional difficulty.

Fourth, for similar reasons, there is no underlying basis for the dissent's insistence on a super-clear, affirmatively phrased denial of jurisdiction over constitutional claims in expedited removal cases. The reason why a clear statement is required with respect to denials of judicial review of constitutional claims is "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Elgin*, 567 U.S. at 9 (citations omitted). But that

predicate is absent here, because denying all judicial review of constitutional questions concerning admission of an arriving alien does not raise a substantial constitutional question. In *Thuraissigiam*, this court had held that an arriving alien "'had a constitutional right to expedited removal proceedings that conformed to the dictates of due process,'" but the Supreme Court disagreed, noting that "[t]hat holding is contrary to more than a century of precedent." 140 S. Ct. at 1981–82 (quoting 917 F.3d at 1111 n.15). Because an arriving alien "has no constitutional rights regarding his application," the Court explained, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Id*. at 1982 (citation omitted). Because the "procedure authorized by Congress" here purposefully precludes resort to the courts, that denial of judicial review cannot be said to deny due process. As we explained in *Guerrier*, "*Thuraissigiam*'s conclusion that the Due Process Clause does not require review of how the agency determines whether a noncitizen subject to expedited removal is eligible for asylum precludes this court from reviewing Guerrier's petition, *despite his raising a colorable constitutional claim*." 18 F.4th at 312 (emphasis added).

The dissent implausibly tries to limit *Guerrier* to its specific facts, concluding that the "colorable constitutional claim" in that case was not the "type of due process claim that we have jurisdiction to consider." *See* Dissent at 64–65. The distinction is unfathomable. The whole premise of the dissent is that, "because there is no other judicial forum for constitutional challenges to expedited removal orders, and because Congress has enacted no *explicit* provision precluding judicial review of constitutional claims in that context, we must apply the long-standing presumption that *colorable constitutional claims receive judicial review*." *See* Dissent at 63 (second emphasis added). It necessarily

follows from the dissent's premise that *all* "colorable constitutional claims receive judicial review," and that premise therefore does not allow for any distinction among such claims. But the dissent's premise, of course, is flatly inconsistent with *Guerrier*'s holding that "*Thuraissigiam* abrogated any 'colorable constitutional claims' exception to the limits 8 U.S.C. § 1252(a)(2)(A) [INA § 242(a)(2)(A)] places on this court's jurisdiction to review Guerrier's petition." 18 F.4th at 313. The dissent's effort to evade *Guerrier* by positing an unexplained (and inexplicable) distinction between some subset of "colorable constitutional claims" over which we retain jurisdiction and another subset of "colorable constitutional claims" over which we lack jurisdiction is unprincipled and ad hoc. There is no coherent basis for distinguishing *Guerrier*, and that decision refutes the dissent's analysis.[10]

Fifth, the dissent's reading of § 242(a)(2)(D) rests on an untenable distinction between that section's reference to "constitutional claims" and its reference to "questions of law." On its face, the rule of construction set forth in § 242(a)(2)(D) applies equally to both of these categories, which are set forth in the same noun phrase: "Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of *constitutional claims or questions of law* raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." 8 U.S.C. § 1252(a)(2)(D)

---

[10] What the dissent really seems to be saying is that, under its reading of *Thuraissigiam*, the constitutional claim asserted in *Guerrier* was *not* colorable, because it was based on a "challenge[] [to] the details of how the [expedited removal] determination had been made." *See* Dissent at 64. But *that* proffered distinction is foreclosed by *Guerrier*, which squarely holds that "we conclude that Guerrier raises a colorable constitutional claim." 18 F.4th at 311.

(emphasis added).  We held in *Singh* that the language of § 242(a)(2)(A) and § 242(a)(2)(D) plainly prohibited us from asserting jurisdiction over "legal questions" involving expedited removal orders, and that they did so with sufficient clarity to satisfy the clear statement rule applicable to prohibitions on "judicial review of administrative action." 982 F.3d at 781, 784 (citation omitted).  Because § 242(a)(2)(D) adopts an identical rule, using a single noun phrase, with respect to *both* "constitutional claims or questions of law," the construction of the statute that we recognized in *Singh* with respect to "questions of law" necessarily applies equally to the other half of the noun phrase, "constitutional claims." *See Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 329 (2000) ("[W]e refuse to adopt a construction that would attribute different meanings to the same phrase in the same sentence, depending on which object it is modifying").  The dissent's effort to avoid *Singh* by drawing a distinction between "questions of law" and "colorable constitutional claims" therefore fails. *See* Dissent at 44 n.3.

The dissent seems to think that the clear statement rule applicable to limitations on judicial review of *constitutional claims* is sufficient to support such a distinction, but that is wrong. *St. Cyr*, after all, relied primarily on a comparable clear statement rule applicable to denial of all judicial review of *questions of law*, *see* 533 U.S. at 300, 305, and so *both* halves of the noun phrase "constitutional claims or questions of law" are subject to clear statement rules.  And, of course, *Singh* found the language of § 242(a)(2) to constitute a sufficiently clear statement of Congress's intent. *See* 982 F.3d at 781. The dissent's conclusion simply cannot be reconciled with *Singh*.

Sixth, the dissent's reading of the statute violates the settled rule that a statutory construction "that furthers rather

than obstructs the [statute's] purpose should be favored." *Connell v. Lima Corp.*, 988 F.3d 1089, 1101 (9th Cir. 2021) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012)). As the title of § 235 confirms, the purpose of § 235(b)(1)'s special procedures is to ensure the "expedited removal of inadmissible arriving aliens," and that purpose is further underscored by the statute's strict time deadlines on IJ review of credible fear determinations. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III) ("Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I)."). Recognizing a right to judicial review of colorable constitutional claims in expedited removal cases would largely thwart that purpose by interposing the substantial delays associated with such review into what is supposed to be a highly streamlined process designed to expeditiously evaluate the claims of an alien who arrives at the doorstep of our Nation. That is further confirmation that the dissent's reading of § 242 is plainly incorrect.

In a considerable understatement, the dissent concedes that adding a "layer of review for constitutional claims may slow that process." *See* Dissent at 63. But the dissent argues that we should overlook the demolition of the expedited removal system that would result from such review, because acknowledging that consequence would supposedly improperly take into account "policy considerations." *Id.* On the contrary, the fact that the dissent's egregious misreading of the INA would produce a result that "effectively thwart[s] the Act's manifest purpose," confirms how thoroughly wrong the dissent's position is. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 36 (2015) (citation omitted).

**IV**

Even if the dissent were right that we retain jurisdiction over "colorable constitutional claims," Mendoza-Linares's petition must still be dismissed because he has not presented any such colorable constitutional claim.

Mendoza-Linares's contention is that, under our decision in *East Bay*, the Transit Bar's substantive limitations on the granting of asylum are contrary to the INA and that the asylum officer and IJ therefore erred in relying on the Transit Bar in concluding that there was not a "significant possibility" that he "could establish eligibility for asylum" under the INA. 8 U.S.C. § 1225(b)(1)(B)(v). He argues that the asylum officer and the IJ should instead have focused on whether there was a significant possibility that he could establish a well-founded fear of persecution on a protected ground. This is a colorable *statutory* argument; indeed, under our caselaw, it would seem to be meritorious. *See East Bay*, 993 F.3d at 669–75. But to fall within the jurisdiction that the dissent posits, Mendoza-Linares must present a colorable *constitutional* claim. He has not done so.

Mendoza-Linares attempts to dress up his statutory argument in constitutional garb by asserting that he has a "liberty interest," protected by procedural due process, in the "statutory rights" reflected in the INA's expedited-removal provisions. This argument is directly contrary to *Thuraissigiam*, which explicitly rejected our view that arriving aliens have "a constitutional right to expedited removal proceedings that conform[] to the dictates of due process." 140 S. Ct. at 1981 (citation omitted).

Mendoza-Linares alternatively argues that *Thuraisiggiam* itself effectively constitutionalized the statutory procedures governing expedited removal. Seizing

on the Court's comment that "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law," 140 S. Ct. at 1982 (citation omitted), Mendoza-Linares argues that, as a result, any violation of the statutory procedures governing expedited removal constitutes a failure to provide due process. The dissent endorses this audacious argument, which it claims is further supported by *Guerrier*'s statement that "in the expedited removal context, a petitioner's due process rights are *coextensive* with the statutory rights Congress provides." 18 F.4th at 310 (emphasis added) (quoted at Dissent at 64). But *Thuraissigiam* reaffirmed that "'an alien seeking initial admission to the United States requests a privilege and *has no constitutional rights regarding his application*,'" meaning that such an alien "has only those rights regarding admission that Congress has provided by statute." 140 S. Ct. at 1982–83 (citation omitted). Accordingly, any rights Mendoza-Linares may have in regard to removal or admission are purely statutory in nature and are not derived from, or protected by, the Constitution's Due Process Clause. By insisting that the "rights regarding admission that Congress has provided by statute," *id*. at 1983, should be deemed be of *constitutional* status, the dissent would turn *Thuraissigiam* on its head. *See* Dissent at 63–65.

Moreover, the dissent's finding of a colorable constitutional claim in this case fails on its own terms. The dissent argues that the Due Process Clause requires that Mendoza-Linares be afforded the statutory "right to a determination whether he had a significant possibility of establishing eligibility for asylum." *See* Dissent at 64 (citation omitted). But as explained earlier, Mendoza-Linares plainly received such a determination, and it was adverse. *See supra* at 22. Mendoza-Linares's complaint is instead that this determination was tainted by the Transit

Bar, but that goes to the *merits* of that determination and "*how* it was made," 140 S. Ct. at 1983 (emphasis added), and the dissent concedes that, even under its reading of *Thuraissigiam*, Mendoza-Linares has no due process right to review of any such matters, *see* Dissent at 64–65, which go beyond ascertaining that such a "determination" was made.[11]

## V

Because § 242 bars us from asserting jurisdiction over Mendoza-Linares's petition for review, and a habeas court would likewise lack jurisdiction, the only remaining question is whether, by denying all judicial review, § 242 is unconstitutional as applied in this case. In view of the fact that Mendoza-Linares lacks any constitutionally protected due process rights concerning whether he will be removed or admitted, *see supra* at 31–32, 37–38, the answer to that question is plainly no. Further, the Supreme Court in *Thuraissigiam* expressly rejected the alternative theory that a complete denial of judicial review in expedited removal cases effects an unconstitutional suspension of the writ of habeas corpus. *See* 140 S. Ct. at 1971–81.

---

[11] Mendoza-Linares also briefly contends that he has presented a colorable constitutional claim that denying judicial review would leave in place an administrative regime that violates the nondelegation doctrine. This argument lacks merit. The asylum laws are adequately governed by an "intelligible principle" supplied by Congress, *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality), and those legislatively prescribed "discernable standard[s]" are "adequate under the approach th[e] [Supreme] Court has taken for many years" in assessing such questions, *id.* at 2131 (Alito, J., concurring in the judgment). The fact that, due to the lack of judicial review, errors may occur in the application of the expedited removal statute in particular cases does not give rise to a nondelegation problem.

Because we lack jurisdiction to consider the petition for review, we dismiss Mendoza-Linares's petition.

**PETITION FOR REVIEW DISMISSED.**

---

GRABER, Circuit Judge, dissenting:

I dissent. The majority opinion flouts both Congressional intent and binding precedent from the Supreme Court and this court, depriving a litigant of the judicial review to which he is entitled with respect to his colorable—indeed, meritorious—constitutional claim.

Petitioner Hever Alberto Mendoza Linares is a native and citizen of El Salvador. After passing through Guatemala and Mexico, he entered the United States without inspection. Officers from the Department of Homeland Security ("DHS") detained him on the same day. Two days later, pursuant to 8 U.S.C. § 1225, DHS issued an expedited removal order against Petitioner. An asylum officer, after conducting a "credible fear" interview, concluded that Petitioner had not shown a reasonable fear of future persecution on account of a protected ground, even though Petitioner himself was credible. Petitioner sought review by an immigration judge ("IJ"), who held a hearing and affirmed the expedited removal order. The IJ rejected Petitioner's asylum claim solely because of 8 C.F.R. § 208.13(c)(4) (2020). That regulation, which the parties refer to as the "Transit Bar," restricted asylum for a non-

citizen like Petitioner who traveled to the United States through a country other than his own.[1]

Petitioner timely petitions for review in this court, arguing that the IJ violated his due process rights by failing to consider, as the statute requires, whether he has a credible asylum claim. In my view: (1) We have jurisdiction to review Petitioner's colorable constitutional claim, because no other judicial forum exists in which that claim can be reviewed and Congress has not explicitly foreclosed our review of colorable constitutional claims; (2) Petitioner did not receive the process that Congress provided because the IJ did not consider whether Petitioner had established a significant possibility that he could show eligibility for asylum. 8 U.S.C. § 1225(b)(1). Accordingly, I would grant the petition and remand for further proceedings.

## BACKGROUND

On February 10, 2020, Petitioner entered the United States without a valid entry document. An immigration official determined that Petitioner was inadmissible and processed him for expedited removal. Because Petitioner expressed a fear of returning to El Salvador, the immigration official referred Petitioner to an asylum officer for a "credible fear" interview.

An asylum officer interviewed Petitioner on March 31, 2020. Petitioner testified that he had traveled to the United States through two countries after leaving El Salvador: Guatemala and Mexico. At the time, the Transit Bar prohibited a grant of asylum to any non-citizen "who enters,

---

[1] I use the term "non-citizen" as shorthand for "non-citizen of the United States" and as equivalent to the statutory term "alien." See 8 U.S.C. § 1101(a)(3).

attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the" non-citizen's home country "en route to the United States." 8 C.F.R. § 208.13(c)(4) (2020).[2]  Petitioner told the officer that his work as a disc jockey for clients at political events had required him to speak anti-crime statements into a microphone.  Those statements triggered retaliation by criminal groups.  Criminals shot at, and threw rocks at, Petitioner "about [six] times" while he worked at his job. Petitioner's other anti-crime activities outside of work caused the MS-13 gang to beat up Petitioner in his home, twice.  Petitioner further testified that this history, along with his tattoos, would put him in danger if he returned to El Salvador.  Although the asylum officer found Petitioner to be a credible witness, the officer determined that Petitioner was ineligible for asylum under the Transit Bar.

A supervisor approved the asylum officer's finding. Petitioner sought review by an IJ.

On May 28, 2020, the IJ affirmed the decision of the asylum officer.  Though the IJ thought that "the asylum officer made a mistake when the officer concluded that the past harm that [Petitioner] faced could not constitute persecution under the law of the Ninth Circuit[,]" the IJ agreed "with the overall conclusion" of the asylum officer.

---

[2]  The regulation includes three exceptions, none of which applies here: (1) the non-citizen applied for and received a final judgment denying protection in at least one such country; (2) the non-citizen was a "victim of a severe form of trafficking in persons" under 8 C.F.R. § 214.11; or (3) the non-citizen traveled only through countries not parties to the relevant international agreements.  8 C.F.R. § 208.13(c)(4)(i)–(iii) (2020).

Specifically, the IJ held that the Transit Bar applied, foreclosing any possibility of asylum.

The IJ also praised Petitioner's credibility, sincerity, and the underlying actions that had caused Petitioner to have trouble with the El Salvadoran gangs:  "Like the asylum officer, I find that you're very credible.  You strike me as a sincere, hardworking individual. . . . You did have the guts to paint over the gang symbol for the house that you were renting, and you were threatened by and harmed by the gangs for doing that, and then you did it a second time."  But the IJ noted that "[t]he laws are very specific.  And for the reasons that I just determined, the asylum officer made the . . . correct determination in your case."

On June 8, 2020, Petitioner timely filed this petition for review.  He remains detained.

## STANDARD OF REVIEW

"We determine our own jurisdiction de novo.  We also review constitutional claims de novo."  Guerrier v. Garland, 18 F.4th 304, 308 (9th Cir. 2021) (citations and internal quotation marks omitted).  Likewise, claims of "due process violations in removal proceedings" are reviewed de novo. Cruz Rendon v. Holder, 603 F.3d 1104, 1109 (9th Cir. 2010).

## JURISDICTION

DHS challenges our jurisdiction, contending that "[t]here is no cause to address any merits issue because the petition for review should be dismissed."  Specifically, DHS argues that a jurisdiction-stripping statute, 8 U.S.C. § 1252, removes any judicial forum for review.  On the merits, Petitioner asserts a violation of his constitutional rights, namely his right to due process.  The question, then, is

whether we retain jurisdiction to review Petitioner's due process claim.

For Congress to deny a litigant "any judicial forum for a colorable constitutional claim," Congress must make "clear" that it intended to preclude our review. Webster v. Doe, 486 U.S. 592, 603 (1988); see also Garland v. Aleman Gonzalez, 142 S. Ct. 2057, 2067 (2022); (citing Webster with approval); Elgin v. Dep't of Treasury, 567 U.S. 1, 9 (2012) ("Webster's standard does not apply where Congress simply channels judicial review of a constitutional claim to a particular court."). That is, if there is no judicial forum and no clear preclusion, we consider it "at least as likely that Congress failed to address the issue, or assumed review of constitutional questions, as it is that Congress sought to preclude such review altogether." Marozsan v. United States, 852 F.2d 1469, 1479 (7th Cir. 1988) (en banc). We have explained the rule as follows: unless Congress provides "an explicit statutory provision that bars judicial consideration of [Petitioner]'s constitutional claims, we should conclude that Congress did not intend to preclude consideration of colorable constitutional claims arising out of actions taken under a federal statute." Ctr. for Biological Diversity v. Bernhardt, 946 F.3d 553, 561 (9th Cir. 2019) (first emphasis added) (citations and internal quotation marks omitted).[3]

In short, we retain jurisdiction if Congress provided (1) no forum for judicial review and (2) no explicit text that precludes our review of constitutional claims; and finally, as

---

[3] A different rule applies to non-constitutional questions of law. As to those questions, we lack jurisdiction. Singh v. Barr, 982 F.3d 778, 783 (9th Cir. 2020). Singh did not involve, and therefore did not consider, whether we have jurisdiction to review colorable constitutional claims relating to expedited removal orders.

an added requirement to prevent abuse of this rule, we retain jurisdiction only (3) if the constitutional claim is colorable.

1. <u>Congress Provided No Forum for Petitioner's Constitutional Claim.</u>

a.  <u>Direct Review of Removal Order</u>

Petitioner challenges an order of removal issued by DHS.  Title 8 U.S.C. § 1252 establishes the scheme for judicial review of final removal orders.  Captioned "[g]eneral orders of removal," subsection (a)(1) states in full:

> <u>Judicial review of a final order of removal</u> (other than an order of removal without a hearing [under the expedited removal program]) <u>is governed only by [the Hobbs Act]</u>, except as provided in subsection (b) and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

<u>Id.</u> § 1252(a)(1) (emphasis added).  The Hobbs Act, in turn, vests the federal courts of appeals with "exclusive jurisdiction" to, among other things, "set[] aside . . . in whole or in part, the order of the agency" at issue.  28 U.S.C. § 2349(a).  Thus, Congress designated the federal courts of appeals as the proper forum to review challenges, like Petitioner's, that seek to set aside final orders of removal.[4]

---

[4]  I disagree with DHS's argument that § 1252(a)(1) expressly excludes jurisdiction over all expedited removal orders.  Subsection (a)(1) excludes review of "order[s] of removal <u>without a hearing</u> [under the expedited removal program]."  8 U.S.C. § 1252(a)(1) (emphasis added).  Here, Petitioner received a hearing when an immigration judge reviewed his appeal.  <u>See id.</u> § 1225(b)(1)(B)(iii)(III) ("Such review shall include

But that does not mean that we may entertain Petitioner's challenge.  Petitioner challenges a removal order that arose through a process known as "expedited removal."  Through the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), Congress eliminated almost all judicial review of challenges related to that category of removal orders.  Specifically, Congress declared that "no court shall have jurisdiction to review—except as provided in subsection (e), any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of [expedited] removal."  8 U.S.C. § 1252(a)(2)(A)(i) (emphasis added).

That text, on its face, sweeps broadly.  Indeed, the Supreme Court recently interpreted this very section by noting that "the word 'any' has an expansive meaning," Patel v. Garland, 142 S. Ct. 1614, 1622 (2022) (internal quotation marks omitted), and that the phrase the "operation of" "refer[s] to the Government's efforts to enforce or implement" the relevant statutes.  Aleman Gonzalez, 142 S. Ct. at 2064 (2022).  "[E]xcept as provided in subsection (e)," a federal court may not review any claim relating to the government's effort to enforce or implement an expedited removal order.  8 U.S.C. § 1252(a)(2)(A)(i).  Petitioner

---

an opportunity for the alien to be heard and questioned by the immigration judge, either in person or by telephonic or video connection.").  The removal order also qualifies as a "final" order of removal because the order cannot be appealed administratively.  See, e.g., Bartolome v. Sessions, 904 F.3d 803, 809 (9th Cir. 2018) (noting, in a different procedural context, that we retain jurisdiction under § 1252(a)(1) to review an immigration judge's non-appealable order of removal); Tomas-Ramos v. Garland, 24 F.4th 973, 980 n.3 (4th Cir. 2022) ("Because the streamlined process . . . does not include an appeal to the Board of Immigration Appeals, the IJ's ruling on review . . . is the agency's 'final order' for purposes of judicial review under 8 U.S.C. § 1252(a)(1).").

brings such a claim. The text does not distinguish among reasons for seeking review. Thus, 8 U.S.C. § 1252(a)(2)(A)(i) closes the door to all review "except as provided in subsection (e)."

This construction aligns with our prior decisions. See, e.g., United States v. Barajas-Alvarado, 655 F.3d 1077, 1082 (9th Cir. 2011) ("Congress expressly deprived courts of jurisdiction to hear a direct appeal from an expedited removal order."); Avendano-Ramirez v. Ashcroft, 365 F.3d 813, 818 (9th Cir. 2004) ("We have described this section as one which illustrates that when Congress meant to strip jurisdiction over all matters relating to an immigration order or decision, it did so unequivocally and unambiguously." (internal quotation marks omitted)). It also aligns with the general aim of IIRIRA: "to protect the Executive's discretion from undue interference by the courts[.]" Dep't Homeland Sec. v. Thuraissigiam, 140 S. Ct. 1959, 1966 (2020) (internal quotation marks omitted). Unless subsection (e) presents a path for review, there is no statutorily authorized forum for Petitioner's constitutional claim.

## b. Other Forms of Review

Subsection (e) provides "some avenues of judicial review." Pena v. Lynch, 815 F.3d 452, 456 (9th Cir. 2016), abrogated on other grounds as stated in Guerrier, 18 F.4th at 311. But "it limits review to specific challenges and venues." Singh, 982 F.3d at 782. The relevant provision, subsection (e)(2), states:

> Judicial review of any determination made under [the expedited removal program] is available in habeas corpus proceedings, but shall be limited to determinations of—

(A)   whether the petitioner is an alien,

(B)   whether the petitioner was ordered removed under such section, and

(C)   whether the petitioner can prove . . . that the petitioner is [a lawful permanent resident], has been admitted as a refugee, . . . or has been granted asylum . . . .

8 U.S.C. § 1252(e)(2).[5]   On its face, neither (A) nor (C) applies here—Petitioner concedes that he is not a citizen of the United States and that he has never been granted lawful entry.[6]

Nor does subparagraph (B) apply.  It means that "the court may only ask whether there was a removal order and whether it relates to the petitioner." Avendano-Ramirez, 365 F.3d at 819 n.16.  We may not ask whether a non-citizen "was wrongfully deprived of the administrative review permitted under the statute and applicable regulations." Barajas-Alvarado, 655 F.3d at 1082; see also Castro v. U.S. Dep't Homeland Sec., 835 F.3d 422, 431 (3rd Cir. 2016)

---

[5]  See also subsection (e)(5), titled "[s]cope of inquiry," which provides:

> In determining whether an alien has been ordered removed under [the expedited removal program], the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner.  There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

Id. § 1252(e)(5) (emphasis added).

[6]  Subsection (e)(3) also authorizes certain system-wide challenges, but Petitioner's as-applied challenge is not that kind of challenge.  Id. § 1252(e)(3).

(review under subparagraph (B) "should only be for whether an immigration officer issued that piece of paper and whether the Petitioner is the same person referred to in that order" (internal quotation marks omitted)).

To be sure, some courts have found review available through the Suspension Clause. See, e.g., LaGuerre v. Reno, 164 F.3d 1035, 1039 (7th Cir. 1998); Ramallo v. Reno, 114 F.3d 1210, 1214 (D.C. Cir. 1997). But the Supreme Court clarified recently that the Suspension Clause does not require "'administrative or judicial review leading to' 'authorization for an alien [stopped at the border] to remain in a country other than his own.'" Singh, 982 F.3d at 784 n.4 (quoting Thuraissigiam, 140 S. Ct. at 1971–81) (brackets in original). So the Suspension Clause offers no avenue for Petitioner's claim.

Nor can Petitioner seek review under any other statute. Congress explicitly eliminated alternative paths to relief in § 1252. Subsection (a)(5) provides that a petition for review, filed timely in the appropriate court of appeals, is the "sole and exclusive means for judicial review of an order of removal." 8 U.S.C. § 1252(a)(5). And, except as provided in § 1252 itself, "no court shall have jurisdiction . . . to review such an order or such questions of law or fact." Id. § 1252(b)(9). Congress thereby firmly closed the door to any forum for review of ordinary legal challenges.

But a "foreboding line of Supreme Court cases" consistently has construed statutory text, no matter how sweeping, to permit review of colorable constitutional claims. Bartlett v. Bowen, 816 F.2d 695, 700 & n.15 (D.C. Cir. 1987) (citing cases). In Johnson v. Robison, 415 U.S. 361 (1974), for example, a conscientious objector challenged a federal statute that provided educational

benefits to veterans but excluded conscientious objectors. Id. at 364. His action appeared to be barred by statute:

> [T]he decisions of the Administrator on <u>any</u> question of law or fact under <u>any</u> law administered by the Veterans' Administration providing benefits for veterans . . . shall be <u>final and conclusive</u> and no other official or <u>any court of the United States shall have power or jurisdiction to review any such decision</u> . . . .

38 U.S.C. § 211(a) (1970) (repealed 1991) (emphasis added). Despite the breadth of that text, the Supreme Court refused to interpret the provision in a manner that would have foreclosed all judicial review. Constitutional claims could proceed. Johnson, 415 U.S. at 366.

Similarly, in Oestereich v. Selective Serv. Sys. Local Bd. No. 11, 393 U.S. 233 (1968), the Court interpreted a provision limiting review of Selective Service decisions. During the 1960s, the Selective Service Commission retaliated against students involved in anti-Vietnam War protests. Some federal courts found the Commission's actions to be illegal. Congress responded by adopting a statute that stripped judicial review over such challenges: "No judicial review shall be made of the classification or processing of <u>any</u> registrant . . . except as a defense to a criminal prosecution . . . after the registrant has responded either affirmatively or negatively to an order to report for induction." Military Selective Service Act of 1967, Pub. L. No. 90-40, 81 Stat. 100, 104 (1967) (codified at 50 U.S.C. § 460(b)(3) (1964)) (emphasis added). Despite the clarity of that text, the Court permitted constitutional claims to be heard. The Court noted that "[e]xamples are legion where literalness in statutory language is out of harmony . . . with

constitutional requirements . . . ." Oestereich, 393 U.S. at 238.

We, too, have long construed seemingly ironclad statutory provisions to permit review of constitutional claims. In Kicking Woman v. Hodel, 878 F.2d 1203 (9th Cir. 1989), for example, relatives of Joseph Kicking Woman sought review of an administrative finding that Leo Lee Old Person was Joseph's son and sole heir. Id. at 1203–04. A federal statute appeared to bar any review:

> When any Indian to whom an allotment of land has been made, or may hereafter be made, dies before the expiration of the trust period and before the issuance of a fee simple patent, without having made a will disposing of said allotment as hereinafter provided, the Secretary of the Interior, upon notice and hearing, under such rules as he may prescribe, shall ascertain the legal heirs of such decedent, and his decision thereon shall be final and conclusive.

25 U.S.C. § 372 (1934) (emphasis added).

Faced with that text—which prior decisions had "interpreted literally" to foreclose all judicial review, Kicking Woman, 878 F.2d at 1206—we considered "[t]he narrow question . . . whether, in the face of a general bar to judicial review, the federal courts have jurisdiction to hear a constitutional challenge to actions (i.e. procedures, proceedings, or decisions) authorized by a specific statute, in the absence of a facial attack on the statute itself." Id. at 1205 n.7. After examining the statutory text and its legislative history, we recognized "a due process exception to the statutory bar" provided by the statute. Id. at 1205. We thus "decline[d] to expand the scope of [the relevant statute]

to constitutionally-founded claims and" held "that the section does not preclude the invocation of" our jurisdiction. Id. at 1207.

In Edelman v. W. Airlines, Inc., 892 F.2d 839, 841 (9th Cir. 1989), after an airline fired a union worker, the union filed a grievance, lost, and sought review. A federal statute appeared to preclude our review. We described the statute governing "the scope of our review of the" agency's order as "among the narrowest known to the law." Id. at 842 (internal quotation marks omitted). The Supreme Court had expressly interpreted the statute as "limited to three specific grounds," Union Pac. R.R. Co. v. Sheehan, 439 U.S. 89, 93 (1978) (per curiam), none of which applied in Edelman. Nonetheless, we held that we had jurisdiction to review "cases in which a prospective plaintiff raises a due process challenge to the conduct of the . . . proceedings." Edelman, 892 F.2d at 845 (ellipsis in original). "[A] constitutional challenge constitutes an independent ground, in addition to the three expressly stated in [the relevant statute], upon which a federal court has jurisdiction to review decisions of" the administrative agency. Id. at 847. In so holding, we reasoned that "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions." Id. (quoting Califano v. Sanders, 430 U.S. 99, 109 (1977) (brackets in original)).

Nor are those decisions outliers. More recently, in Center for Biological Diversity, we considered an action brought by a conservation organization. 946 F.3d at 553. A federal statute enacted "to ensure an expedited process" appeared to preclude our review. Id. at 557. That statute provided simply that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." Id. (quoting 5 U.S.C. § 805). But we concluded

that "we may presume that Congress will use specific language if it intends to foreclose judicial review of constitutional claims. Here, the [j]urisdiction-[s]tripping [p]rovision does not include any explicit language barring judicial review of constitutional claims. Therefore, we presume that Congress did not intend to bar such review." Id. at 561 (emphasis added); see also Cath. Soc. Servs., Inc. v. Reno, 134 F.3d 921, 927 (9th Cir. 1997) (per curiam) ("We agree with Catholic Social Services that a statute that completely immunizes a statute from constitutional attack would raise difficult constitutional issues. Thankfully, however, we need not address those issues." (internal citations omitted)); Staacke v. U.S. Sec'y of Labor, 841 F.2d 278, 281 (9th Cir. 1988) ("Even where the statutory provision absolutely bars judicial review . . . courts maintain jurisdiction to consider constitutional claims[.]").

With that background principle in mind, I turn to the next criteria affecting our jurisdiction: whether Congress explicitly barred review of constitutional claims in the present context and, if not, whether Petitioner's due process claim is colorable.

### 2. Congress Has Not *Explicitly* Barred Constitutional Claims.

I would follow the Supreme Court's template in Guerrero-Lasprilla v. Barr, 140 S. Ct. 1062 (2020), which interpreted this very same section—8 U.S.C. § 1252. There, the Court first examined the statute's text and then utilized other tools of construction: context, statutory history, and legislative history. Guerrero-Lasprilla, 140 S. Ct. at 1068–72.

### a.  Text

Title 8 U.S.C. § 1252(a)(2)(A) and (e), discussed above, do not refer to constitutional claims.  For that reason, § 1252(a)(2)(A) and (e) do not suffice as an explicit Congressional bar to review of constitutional claims. Constitutional claims are mentioned in § 1252(a)(2)(D), but this subparagraph does not explicitly preclude judicial review of constitutional claims.  Captioned "[j]udicial review of certain legal claims," subparagraph (D) provides:

> Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

Id. § 1252(a)(2)(D).  Subparagraph (B) concerns certain discretionary relief; subparagraph (C) concerns certain criminal non-citizens.

One reasonable interpretation of the text of subparagraph (D) is that, by permitting review of constitutional claims as to subparagraphs (B) and (C) but not mentioning subparagraph (A), Congress implied that we lack jurisdiction over constitutional claims that relate to subparagraph (A).  To illustrate the logic, suppose that someone makes the statement, "My children are Anna, Bob, and Cathy."  Logically, one can infer that David's exclusion from that list means that David is not one of the speaker's children.  This logic stands as a canon of statutory interpretation called expressio unius est exclusio alterius: "the canon that expressing one item of a commonly associated group or series excludes another left

unmentioned." United States v. Vonn, 535 U.S. 55, 65 (2002).

But an implication does not meet the "heightened standard" required to bar constitutional claims. Elgin, 567 U.S. at 9; see also Boechler, P.C. v. Comm'r, 142 S. Ct. 1493, 1499 (2022) ("We agree that this is a plausible interpretation of the statute. Some might even think it better . . . . But in this context, better is not enough. To satisfy the clear-statement rule, the jurisdictional condition must be just that: clear."). Something that is implicit, by its nature, is not explicit. Indeed, the Supreme Court has told us as much in other contexts in which a clear statement of congressional intent is required: "[i]mplications from statutory text or legislative history are not sufficient . . . ; instead, Congress must articulate specific and unambiguous statutory directives to effect" the result. INS v. St. Cyr, 533 U.S. 289, 299 (2001), superseded by statute on other grounds as stated in Nasrallah v. Barr, 140 S. Ct. 1683, 1690 (2020).

Adding to the ambiguity, the structure of the sentence in subparagraph (D) contains not a positive assertion of inclusion ("my children are A, B, and C") but rather a statement of non-exclusion. Returning to Anna, Bob, and Cathy, suppose that our speaker makes the following statement: "Nothing about their college grades will prevent Bob and Cathy from getting into law school." Depending on what you know about Anna, you could understand Anna's omission in several different ways. Perhaps Anna is only eight years old and has no college grades. Perhaps Anna is a physicist with no interest in law school. Perhaps Anna's credentials are not in doubt, as she is a straight-A student at college who will be snapped up by every law school to which she applies. Or perhaps Anna is irrelevant to the discussion because she is barely passing her college classes, and those grades will prevent her from attending any law school.

Alternatively, perhaps Anna already is in law school or has passed the bar exam and so the notion of her future admission to law school is inapplicable.  None of those interpretations is inherently the most likely from the parent's bare statement.  Rather, the meaning of the spoken phrase as applied to the silent subject, Anna, depends entirely on the context.

One other interpretive question remains:  the function of the parenthetical phrase in subparagraph (D).  "Nothing in subparagraph (B) or (C), or in <u>any other provision of this chapter (other than this section)</u> which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims  . . . ."    8 U.S.C.  § 1252(a)(2)(D) (emphasis added).  We have interpreted that phrase as follows:

> By this amendment, Congress restored judicial review of constitutional claims and questions of law presented in petitions for review of final removal orders.  It did so by providing that nothing in 8 U.S.C. § 1252(a)(2)(B), (C), or any other provision of the INA shall preclude judicial review of such orders, unless such review is barred by some other provision of 8 U.S.C. § 1252.  In short, <u>Congress repealed all jurisdictional bars to our direct review of final removal orders other than those remaining in 8 U.S.C. § 1252</u> (in provisions other than (a)(2)(B) or (C)) following the amendment of that section by the REAL ID Act.

<u>Fernandez-Ruiz v. Gonzales</u>, 410 F.3d 585, 587 (9th Cir. 2005), <u>as adopted by</u> 466 F.3d 1121, 1124 (9th Cir. 2006) (en banc) (emphasis added).

In other words, although the main aim of the statute is to restore judicial review of certain claims, the parenthetical phrase in subparagraph (D) recognizes that other parts of § 1252 preclude judicial review. As noted, § 1252(a)(2)(A)(i) is just such a provision, barring judicial review here but for the presumption that there must be a judicial forum for constitutional claims unless Congress explicitly directs otherwise. The parenthetical phrase does not change or expand the reach of any extant bar to judicial review.[7] Nor is it an explicit bar to review of constitutional claims in subparagraph (A) for the reasons that I have explained.

### b.  Context

Context is key whenever we deduce meaning through negative implication. As the Chief Justice wrote for the Supreme Court in rejecting the interpretation of a statute offered by the National Labor Relations Board:

> The Board relies on the "interpretive canon, expressio unius est exclusio alterius, 'expressing one item of [an] associated group or series excludes another left unmentioned.'" Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 80 (2002) (quoting Vonn, 535 U.S. at 65). If a sign at the entrance to a

---

[7] Our recent decision in Singh, 982 F.3d at 778, also supports this reading. There, we considered our jurisdiction to review a non-constitutional question of law. We concluded that "[s]ubparagraph (D) does not refer to the non-reviewability provisions of [s]ubparagraph (A), and it is that provision that deprives us of jurisdiction to review" the question of law. Id. at 784. We explained that "[s]ubparagraphs (A), (B), and (C) each establish separate and alternative prohibitions on review of certain matters. . . . Subparagraph (D) . . . only overrides prohibitions contained in (1) a provision of the INA other than § 1252, or (2) either § 1252(a)(2)(B) or (C)." Id. (emphasis added). In other words, subparagraph (D) does not pertain to or alter the bar to judicial review contained in subparagraph (A).

zoo says "come see the elephant, lion, hippo, and giraffe," and a temporary sign is added saying "the giraffe is sick," you would reasonably assume that the others are in good health.

"The force of any negative implication, however, depends on context." Marx v. General Revenue Corp., 568 U.S. 371, 381 (2013). The expressio unius canon applies only when "circumstances support[] a sensible inference that the term left out must have been meant to be excluded." Echazabal, 536 U.S. at 81.

NLRB v. SW General, Inc., 137 S. Ct. 929, 940 (2017) (Roberts, C.J.) (brackets in original) (internal citations simplified) . The Court had explained the limits of the canon further in Marx:

We have long held that the expressio unius canon does not apply "unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it," Barnhart v. Peabody Coal Co., 537 U.S. 149, 168 (2003), and that the canon can be overcome by "contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion," Vonn, 535 U.S. at 65.

Marx, 568 U.S. at 381 (internal citations simplified); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 107–11 (2012) (discussing the negative-implication canon); Longview Fibre Co. v. Rasmussen, 980 F.2d 1307, 1312–13 (9th Cir. 1992) ("Sometimes there is no negative pregnant: 'get milk, bread, peanut butter and eggs at the grocery' probably does not mean 'do not get ice cream.'").

The surrounding structure of § 1252(a)(2) illustrates one reason why it is unlikely that Congress "considered the unnamed possibility and meant to say no to it." Barnhart, 537 U.S. at 168.  The text of subparagraph (A) does not explicitly cross-reference subparagraph (D).  For example, no clause in (A) states that we lack jurisdiction "including over claims restored under subparagraph (D)."  But each of the next two subparagraphs, (B) and (C), includes such an explicit reference.  Subparagraphs (B) and (C) specify that we lack jurisdiction "except as provided in subparagraph (D)."  Id. § 1252(a)(2)(B), (C).  In other words, Congress deliberately made the linkages to new paragraph (D) explicit, and the textual distinction suggests that Congress intended paragraph (D) to bear only on paragraphs (B) and (C).

Accordingly, even if a negative implication could, in theory, constitute the explicit statement of intent that is required, the text does not convey a clear intent.  The explicit reference to (D) in both (B) and (C), coupled with the absence of any link in (A), reinforces that Congress may not have intended to affect (A) at all.  Indeed, an equally reasonable interpretation of the omission is that Congress saw no need to include (A) within subparagraph (D) because it already was established, known, or obvious that constitutional claims in situation (A)—unlike situations (B) and (C)—could be reviewed by the court of appeals.  Cf. Marozsan, 852 F.2d at 1479 ("It is at least as likely that Congress . . . assumed review of constitutional questions, as it is that Congress sought to preclude such review altogether.").  After all, the text of (D) aims to restore review, not eliminate it.

c.   Statutory History

Subparagraph (D)'s statutory history confirms that it does not constitute an explicit statement of intent to foreclose review of constitutional claims.  Congress enacted the jurisdiction-stripping provisions of subparagraphs (A), (B), and (C) in IIRIRA.  But Congress enacted subparagraph (D) almost ten years later, in Section 106 of the Emergency Supplemental Appropriations Act for Defense, the Global War On Terror, and Tsunami Relief Act of 2005, Pub. L. No. 109–13, 119 Stat 231.

Congress enacted subparagraph (D) with only one, very specific goal in mind:  to respond to the Supreme Court's decision in St. Cyr.  See, e.g., Patel, 142 S. Ct. at 1623 ("Congress added this subparagraph [D] after we suggested in St. Cyr that barring review of all legal questions in removal cases could raise a constitutional concern.").  In St. Cyr, the Court held that a prior version of section (a)(2) would be constitutionally suspect if it were interpreted to prohibit all forms of judicial review, including a petition for habeas corpus.  St. Cyr, 533 U.S. at 300.  The Supreme Court "interpreted that predecessor and the other purportedly jurisdiction-stripping provisions as not barring (i.e., as permitting) review in habeas corpus proceedings, to avoid the serious constitutional questions that would be raised by a contrary interpretation."  Guerrero-Lasprilla, 140 S. Ct. at 1071.

In doing so, the Court suggested that the Constitution, at a minimum, protected the writ of habeas corpus "as it existed in 1789," which included a right to a judicial remedy for "detentions based on errors of law, including the erroneous application or interpretation of statutes."  St. Cyr, 533 U.S. at 301–02.  The Court, however, provided Congress with a roadmap for overturning its decision: "Congress could,

without raising any constitutional questions, provide an adequate substitute [for habeas relief] through the courts of appeals." Id. at 314 n.38.

And Congress proceeded to do just that. "It made clear that the limits on judicial review in various provisions of § 1252 included habeas review, and it consolidated virtually all review of removal orders in one proceeding in the courts of appeals." Guerrero-Lasprilla, 140 S. Ct. at 1071. At the same time, Congress also amended section (a)(2) by adding subparagraph (D), which provided that none of the limits on judicial review contained anywhere in Title 8 of the United States Code prohibits review of constitutional claims or other questions of law. Id. "While Congress could have responded to St. Cyr by lifting § 1252's prohibitions on judicial review altogether, it instead excised only the legal and constitutional questions that implicated [the Court's] concern[,]" namely orders related to criminal non-citizens and orders related to discretionary relief. Patel, 142 S. Ct. at 1623. Subparagraph (A), which applied to expedited removal orders, remained wholly irrelevant to that endeavor. Cf. Singh, 982 F.3d at 784 ("By its own terms, [s]ubparagraph (D) does not re-vest jurisdiction in our court over legal questions whose review is prohibited by [s]ubparagraph (A).").

In short, "[t]his statutory history strongly suggests that Congress added the words before us because it sought an adequate substitute for habeas in view of St. Cyr's guidance." Guerrero-Lasprilla, 140 S. Ct. at 1071–72 (emphasis added) (internal quotation marks omitted). Subparagraph (D) aimed to cure the constitutional deficiency, as applied to habeas relief, that the Supreme Court had highlighted in its decision in St. Cyr. By providing a judicial forum in the courts of appeals, Congress channeled what formerly were habeas claims to us.

### d.  Legislative History

As detailed by the Congressional Conference Report on that 2005 bill—which expressed the official views of both the House and the Senate—subparagraph (D) had a singular, precise purpose:  to "provide an 'adequate and effective' alternative to habeas corpus in the court of appeals." Guerrero-Lasprilla, 140 S. Ct. at 1072 (quoting H.R. Rep. No. 109-72, at 175 (2005), reprinted in 2005 U.S.C.C.A.N. 240, 297–300.  Congress did not intend subparagraph (D) to eliminate judicial review in any way, a fortiori by removing our ability to consider colorable constitutional claims.  As the Report explains:

> [Section 106, codified as subparagraph (D)] does not eliminate judicial review, but simply restores such review to its former settled forum prior to 1996.  Under section 106, all aliens who are ordered removed by an immigration judge will be able to appeal to the BIA and then raise constitutional and legal challenges in the courts of appeals.  No alien, not even criminal aliens, will be deprived of judicial review of such claims.  Unlike AEDPA and IIRIRA, which attempted to eliminate judicial review of criminal aliens' removal orders, section 106 would give every alien one day in the court of appeals, satisfying constitutional concerns.

H.R. Rep. No. 109-72, at 174–75 (emphasis added); see also Patel, 142 S. Ct. at 1626 ("The post-St. Cyr amendments expressly extended the jurisdictional bar to judgments made outside of removal proceedings at the same time that they preserved review of legal and constitutional questions made within removal proceedings.").

e. Conclusion

After full consideration of the statute's text, context, and history, I conclude that Congress did not intend for subparagraph (D) to constitute an explicit provision divesting us of all jurisdiction over colorable constitutional claims. Because "[i]t is presumable that Congress legislates with knowledge of [the Supreme Court's] basic rules of statutory construction," McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 496 (1991), we must presume that Congress would have used explicit text had it intended to foreclose judicial review of colorable constitutional claims in expedited removal cases. Because Congress has not done so, we retain jurisdiction to consider Petitioner's constitutional claims.

I recognize the general policy concerns at the core of the expedited removal statute, that is, that "the process . . . be expedited." Thuraissigiam, 140 S. Ct. at 1967. A layer of review for constitutional claims may slow that process. But "we inevitably swerve out of our lane when we put policy considerations in the driver's seat." Patel, 142 S. Ct. at 1627.

In sum, because there is no other judicial forum for constitutional challenges to expedited removal orders, and because Congress has enacted no explicit provision precluding judicial review of constitutional claims in that context, we must apply the long-standing presumption that colorable constitutional claims receive judicial review.

3. Petitioner Asserts a Constitutional Claim That Is Colorable.

Finally, I turn to whether Petitioner's constitutional claim is "colorable." We superimpose this requirement to prevent a petitioner from creating jurisdiction "that Congress

chose to remove simply by cloaking an abuse of discretion argument in constitutional garb." Torres–Aguilar v. INS, 246 F.3d 1267, 1271 (9th Cir. 2001). To be colorable, "the alleged violation need not be substantial but the claim must have some possible validity." Id. (citations and internal quotation marks omitted). Our analysis "must look beyond the label." Id.

"Immigration proceedings, although not subject to the full range of constitutional protections, must conform to the Fifth Amendment's requirement of due process." Salgado-Diaz v. Gonzales, 395 F.3d 1158, 1162 (9th Cir. 2005), as amended (March 10, 2005). "[I]n the expedited removal context, a petitioner's due process rights are coextensive with the statutory rights Congress provides." Guerrier, 18 F.4th at 310. But we do not retain jurisdiction to review every violation of a statutory right. For expedited removals, a petitioner "has only those rights regarding admission that Congress provided by statute[,]" namely, "the right to a determination whether he had a significant possibility of establishing eligibility for asylum[.]" Thuraissigiam, 140 S. Ct. at 1983 (internal quotation marks omitted). If the Petitioner "was given that right[,]" then "the Due Process Clause provides nothing more, it does not require review of that determination or how it was made." Id.

In Guerrier, we dismissed a petition even though it asserted a colorable constitutional claim because the petitioner challenged the details of how the determination had been made. 18 F.4th at 312–13. Here, by contrast, Petitioner asserts that he did not receive any determination as contemplated by Congress. That assertion is not only colorable, but meritorious, as discussed below. Thus, Petitioner asserts the limited type of due process claim that

we have jurisdiction to consider.[8] See Landon v. Plasencia, 459 U.S. 21, 34–35 (1982) ("The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.").

Accordingly, I turn now to the merits.

## DUE PROCESS

As noted above, "in the expedited removal context, a petitioner's due process rights are coextensive with the statutory rights Congress provides." Guerrier, 18 F.4th at 310. For expedited removals, Congress provided the following procedure by statute. An asylum officer, a supervisor, and a reviewing IJ must determine whether a non-citizen subject to expedited removal has a "credible fear of persecution." 8 U.S.C. § 1225(b)(1)(B)(ii)–(iii). Congress defined that term to mean "a significant possibility, taking into account the credibility of the statements made by the [non-citizen] in support of the [non-citizen's] claim and such other facts as are known to the officer, that the [non-citizen] could establish eligibility for asylum under [§] 1158." Id. § 1225 (b)(1)(B)(v).

Here, there is no question that the IJ's decision did not take into account the credibility of Petitioner's statements or

---

[8] Petitioner seeks review only of the IJ's "denial of his asylum claim and the resulting order of removal." I therefore consider only Petitioner's asylum claim. To the extent that Petitioner challenges the determination respecting his claims for withholding of removal and relief under the Convention Against Torture ("CAT"), we lack jurisdiction. Guerrier, 18 F.4th at 313. The Transit Bar changed the criteria for withholding of removal and CAT protection but did not preclude a determination, as it did with respect to asylum. See 8 C.F.R. § 208.13(c)(4) (2020).

any other facts known to the IJ that Petitioner could have used to establish a "significant possibility" of demonstrating eligibility for asylum.  To the contrary, as shown below, the IJ crossed out that part of the form.  Instead, the decision relied on the Transit Bar only:

IMMIGRATION COURT
7488 CALZADA DE LA FUENTE
SAN DIEGO, CA  92154

In the Matter of:                    Case No:  A213-209-821
MENDOZA-LINARES, HEVER ALBERTO
  Applicant

CREDIBLE FEAR REVIEW PROCEEDINGS
ORDER OF THE IMMIGRATION JUDGE

A review of the Department of Homeland Security's (DHS) Credible Fear
Determination was held in this matter. Testimony [✗] was [    ] not taken
regarding the Applicant's background and the Applicant's fear of returning
to his/her country of origin or last habitual residence.

After de novo consideration of the evidence, the court finds that the
Applicant [✗] is [    ] is not subject to the third-country-transit
asylum eligibility bar, 8 C.F.R. § 1208.13(c)(4), as an alien who entered,
attempted to enter, or arrived in the United States across the southern land
border of the United States on or after July 16, 2019, who did not apply for
protection from persecution or torture in at least one country outside the
alien's country of citizenship, nationality, or last lawful habitual
residence en route to the United States, and who is not a "victim of a
severe form of trafficking" as defined  by 8 C.F.R. § 214.11

After de novo consideration of the evidence, the court finds that:
    [    ] The Applicant [    ] has [    ] has not established a significant
    possibility that the alien could establish eligibility for asylum,
    withholding of removal, or protection under the Convention Against
    Torture. 8 C.F.R. §§ 1003.42(d)(1), 1208.30(g)(2)(iv)(A)-(C).

    [✗] The Applicant, who is subject to the third-country-transit
    asylum eligibility bar, has [    ] has not established a reasonable
    fear of persecution or torture that would entitle the alien to
    withholding of removal or protection under the Convention Against
    Torture. 8 C.F.R. § 1208.30(g)(1)(ii).

ORDER: It is hereby ordered that the decision of the DHS immigration
    officer is:
        [✗]  Affirmed.  The case is returned to the DHS for removal
                        of the alien, or any other such action under the
        [    ]  Vacated.  law within its authority.

This is a final order.  No appeal is available. INA § 235(b)(1)(C);
8 C.F.R. § 1003.42(f).  For reasons stated on the record to R

Date: May 27, 2020

                                      RICO J. BARTOLOMEI
                                      Immigration Judge

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:
MAIL [M]  PERSONAL SERVICE [P]  ELECTRONIC SERVICE [E]
TO: [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  [ ] ALIEN'S ATT/REP  [ ] DHS
DATE: 5/28/20        BY: COURT STAFF                              UQ

000001

Accordingly, unless the IJ's reliance on the Transit Bar constituted a sufficient "determination whether [Petitioner] had a significant possibility of establishing eligibility for asylum," Thuraissigiam, 140 S. Ct. at 1983 (internal quotation marks omitted), the IJ failed to undertake the statutorily-required review of Petitioner's claims.

As a matter of law, however, reliance on the Transit Bar could not meet the statutory requirements. In general, any action taken under an agency's rule that has been vacated due to the lack of proper notice and comment has no legal force or effect. Paulsen v. Daniels, 413 F.3d 999, 1007–08 (9th Cir. 2005); W.C. v. Bowen, 807 F.2d 1502, 1505 (9th Cir. 1987), as amended on denial of reh'g 819 F.2d 237 (9th Cir. 1987); Buschmann v. Schweiker, 676 F.2d 352, 358 (9th Cir. 1982); see also United States v. Goodner Bros. Aircraft, Inc., 966 F.2d 380, 384 (8th Cir. 1992) ("A regulation not promulgated pursuant to the proper notice and comment procedures has no force or effect of law and therefore is void ab initio." (internal quotation marks omitted)). Here, on June 30, 2020, a federal district court vacated the Transit Bar for failure to follow the notice-and-comment procedures of the APA. Cap. Area Immigrants' Rts. Coal. v. Trump (CAIR), 471 F. Supp. 3d 25, 57–58 (D.D.C. 2020), appeal dismissed sub nom. No. 20-5271, 2022 WL 696459 (Feb. 24, 2022).[9] Although the district court's order vacated the rule one month after the May 28, 2020, decision by the IJ, the IJ applied a rule that had no legal force or effect.

---

[9] The government appealed the district court's decision, but the United States Court of Appeals for the District of Columbia Circuit dismissed the appeal as moot when DHS issued a final rule—Asylum Eligibility and Procedural Modifications, 85 Fed. Reg. 82,260 (Dec. 17, 2020)—which became effective January 19, 2021.

Accordingly, the IJ did not provide the Petitioner with a "determination whether [Petitioner] had a significant possibility of establishing eligibility for asylum." Thuraissigiam, 140 S. Ct. at 1983 (internal quotation marks omitted). Because the complete absence of such a determination violated Petitioner's constitutional right to due process, I would grant the petition and remand for further proceedings. I therefore dissent.